Gregory Alan NOVAK, individually and by his next friend June Lowery Novak and June Lowrey Novak, individually and on behalf of her son Gregory Alan Novak, Plaintiffs,

v.

COBB COUNTY–KENNESTONE HOSPITAL AUTHORITY dba Kennestone Hospital, Samuel D. Bishop, Bradley D. Henderson, John David Tucker, Richard D. Gray, W. Grady Pedrick, Jerry A. Landers, and Robert D. Ingram, Defendants.

Civ. No. 1:90–cv–1316–JEC.

United States District Court, N.D. Georgia, Atlanta Division.

Feb. 28, 1994.

it also listed the names of the crane operators assigned to the job.

 

Larry R. Wight, Roswell, GA, Donald T. Ridley, Brooklyn, NY, Billy E. Moore, Atlanta, GA, James M. McCabe, Pawling, NY, and Calvin A. Rouse, North Augusta, SC, for plaintiffs.

Roy E. Barnes, Benny C. Priest, Marietta, GA, Daniel S. Reinhardt, Alan P. Shor; Michael A. O'Quinn, Atlanta, GA, Y. Kevin Williams, Marietta, GA, Daniel A. Kent; and William S. Allred, Atlanta, GA, for defendants.

### ORDER

CARNES, District Judge.

This case is presently before the Court on defendants W. Grady Pedrick's and Jerry A. Landers' Motion for Summary Judgment [114–1], defendant Richard G. Gray's Motion for Summary Judgment [115–1], defendants Bradley E. Henderson's and John David Tucker's Motion for Summary Judgment [116–1], and defendants Cobb County–Kennestone Hospital Authority's and Samuel D. Bishop's Motion for Summary Judgment [117–1]. The Court has reviewed the record and the arguments of the parties and, for the reasons set out below, concludes that all defendants' motions for summary judgment should be granted.

### BACKGROUND

Plaintiff Gregory Novak was seriously injured in an automobile accident in Cherokee County, Georgia in the early morning hours of June 18, 1989. He was sixteen years old at the time of the accident. He informed the ambulance personnel at the scene that he was a Jehovah's Witness and that for medical and religious reasons he did not wish to have a blood transfusion. When he arrived at Kennestone Hospital's emergency room, he repeated his wish to have no blood transfusions. After his natural father, Milan Novak, gave permission for Gregory to have surgery, the doctors performed surgery on Gregory without the use of a blood transfusion.[1]

During his stay at Kennestone, Gregory received regular and frequent blood tests due to the nature of his injuries. The last blood test prior to surgery was taken at 3:15 a.m. and reflected a Hemoglobin reading of 11.7 gm/dl (normal range 12.5–15 gm/dl) and a Hematocrit reading of 34% (normal range of 36–46%). The first blood test following surgery was taken at 9:10 a.m. and reflected a Hemoglobin reading of 8.2 and a Hematocrit of 24. The last blood test on June 18, 1989 was taken at 5:18 p.m. and reflected a Hemoglobin reading of 6.6 and a Hematocrit of 20.

By 3:15 a.m. on June 19, 1989, Gregory's blood tests results reflected a Hemoglobin reading of 5.3 and a Hematocrit of 16. At this time, Gregory's doctors became increasingly concerned about the continued decline in these blood test results and attempted to persuade Gregory and June Novak to change their minds with respect to the possibility of a blood transfusion. Both Gregory and his mother remained, nonetheless, resolute. At 2:02 p.m., Gregory's blood tests results reflected a Hemoglobin reading of 5.0 and a Hematocrit reading of 14. Sometime in the afternoon of June 19, 1989, the orthopedic surgeon treating Gregory sought legal intervention by calling the situation to the attention of Kennestone Hospital and its attorneys. In doing so, he expressed his opinion that Gregory was in eminent danger of suffering life-threatening consequences if he did not receive a blood transfusion. The last blood test on June 19, 1989, was taken at 8:42 p.m. and reflected a Hemoglobin reading of 4.7 and a Hematocrit reading of 13.

Kennestone Hospital is operated by defendant Cobb County–Kennestone Hospital Authority ("the Hospital Authority"). On June 19, 1989, legal counsel for the Hospital Authority presented an application for the appointment of a guardian *ad litem* in a hearing before the presiding judge on duty at the

1. Gregory's natural mother and father were divorced and his mother, June Novak, had custody. His father consented to surgery because the hospital was unable to contact his mother. Once his mother was contacted, she made decisions regarding further medical treatment.

Cobb County Superior Court. Defendants Bishop, Pedrick and Landers were present at this hearing. The application was filed in the Clerk's office of the Superior Court of Cobb County at approximately 4:49 p.m. on June 19, 1989, and the matter was assigned to presiding Judge P. Harris Hines. A hearing was held on the application on the evening of June 19. As a result of this hearing, defendant Robert D. Ingram [2] was appointed guardian *ad litem* for Gregory Novak.

Another hearing was held on the morning of June 20, 1989 at the Intensive Care Unit of Kennestone Hospital. After speaking with defendant Bishop, Kennestone Hospital's risk manager, and learning that Mr. Bishop had been advised that Gregory's condition had deteriorated during the night, Judge Hines informed Mr. Bishop that he was coming to the hospital immediately to hold a hearing. Judge Hines initiated the hearing, directed Mr. Bishop as to who should be present, and then presided over the hearing. Defendants Henderson, Tucker, Bishop, Pedrick, Landers and Ingram were present at the hearing. During the hearing, doctors Henderson and Tucker were questioned by the guardian *ad litem*, Mr. Ingram, and Judge Hines about Gregory Novak's medical condition and treatment needs. Upon completion of the testimony, Mr. Ingram petitioned the court to allow Gregory to receive a blood transfusion. At the conclusion of the hearing, Judge Hines entered an order permitting the transfusion to take place. Pursuant to the court's order, Gregory Novak was physically restrained and transfused with three units of packed red blood cells during the afternoon of June 20, 1989.

Gregory Novak was discharged from Kennestone Hospital on August 2, 1989. He is alive and well today and suffers from no known medical complications or adverse physical reactions as a result of the blood transfusion of June 20, 1989. After a lengthy recovery period, he has resumed normal physical activity for a person of his age but suffers from a slight limp due to the injuries he suffered as a result of his accident.

Plaintiffs were not present at either of the hearings nor were they given advance notice of such hearings. Plaintiff June Novak is Gregory Novak's mother and is also a Jehovah's Witness. Neither she nor Gregory ever assented to Gregory Novak's blood transfusion, and both she and Gregory assert separate claims against the defendants. These claims include claims under 42 U.S.C. § 1983 [3] and various state causes of action.

### DISCUSSION

I. *Plaintiffs' Claims Under 42 U.S.C. § 1983.*

Plaintiffs' Complaint seeks redress pursuant to 42 U.S.C. § 1983 ("§ 1983") and various state tort law causes of action. The plaintiffs seek to hold each and every defendant jointly and severally liable for the alleged § 1983 violations. The defendants in this case include the Hospital Authority, Kennestone Hospital's risk manager, the attorneys who represented the Hospital Authority in the hearings conducted on June 19 and 20, 1989, and the doctors treating plaintiff Gregory Alan Novak. The parties agree that defendant Samuel D. Bishop was acting under color of state law in his position as the hospital's risk manager. The plaintiffs argue that the Hospital Authority is liable under § 1983 because Mr. Bishop either acted pursuant to the Authority's official policy or was acting as a policymaker in this case. Plaintiffs further argue that the private defendants are liable under § 1983 because they conspired or acted in concert with a state actor in a course of conduct that resulted in their constitutional deprivations.[4]

---

**2.** Robert Ingram, who was Gregory Novak's guardian *ad litem*, is no longer a defendant in this action as his motion for summary judgment was previously granted by order of this Court.

**3.** Additionally, both plaintiffs seek to recover attorney's fees and expenses of litigation pursuant to 42 U.S.C. § 1988. The Court's disposition of plaintiffs' § 1983 claims, however, precludes the need for any consideration of the § 1988 claims.

**4.** The private defendants in this case include the hospital attorneys, Defendants Pedrick and Landers; and the doctors who treated Gregory Novak, Defendants Henderson, Tucker and Gray. The court appointed guardian *ad litem*, Robert D. Ingram, is no longer a defendant in this action.

In order for there to have been a violation of § 1983, "the conduct complained of must have been committed by a person acting under color of state law and must result in a deprivation of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Bendiburg v. Dempsey*, 909 F.2d 463, 468 (11th Cir.1990) (citations omitted). Although it is not clear from plaintiffs, pleadings, the Court concludes that there were three events during which the conduct of the various defendants arguably could have violated the constitutional rights of the plaintiffs, as alleged in the Complaint:

1) When the *ex parte* hearing to appoint a guardian *ad litem* was sought in Cobb County Superior Court on June 19, 1989;

2) When the June 20, 1989 hearing, which resulted in the order allowing a blood transfusion, was held without notice to the plaintiffs; and

3) When the blood transfusion was administered against the wishes of the plaintiffs on June 20, 1989.

The constitutional questions raised by each of these events are discussed below.

II. *The Summary Judgment Standard.*

█ Summary judgment is not properly viewed as a device that the trial court may, in its discretion, implement in lieu of a trial on the merits. Instead, Rule 56 of the Federal Rules of Civil Procedure *mandates* the entry of summary judgment against a party who fails to make a showing sufficient to establish the existence of *every* element essential to that party's case on which that party will bear the burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). In such a situation, there can be no genuine issue as to any material fact, as a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial. *Id.* at 322–23, 106 S.Ct. at 2552–53.

█ The movant bears the initial responsibility of asserting the basis for his motion. *Id.* at 323, 106 S.Ct. at 2553; *Apcoa, Inc. v. Fidelity Nat'l Bank*, 906 F.2d 610, 611 (11th Cir.1990). However, the movant is not required to negate his opponent's claim. The movant may discharge his burden by merely " 'showing'—that is, pointing out to the district court—that there is an absence of evidence to support the non-moving party's case." *Celotex*, 477 U.S. at 325, 106 S.Ct. at 2554. After the movant has carried his burden, the non-moving party is then required to "go beyond the pleadings" and present competent evidence[5] designating " 'specific facts showing that there is a genuine issue for trial.' " *Id.* at 324, 106 S.Ct. at 2553 (quoting FED.R.CIV.P. 56(e)). While the court is to view all evidence and factual inferences in a light most favorable to the non-moving party, *Samples v. City of Atlanta*, 846 F.2d 1328, 1330 (11th Cir.1988), "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 2509–10, 91 L.Ed.2d 202 (1986).

█ A fact is material when it is identified as such by the controlling substantive law. *Id.* at 248, 106 S.Ct. at 2510. An issue is genuine when the evidence is such that a reasonable jury could return a verdict for the nonmovant. *Id.* at 249–50, 106 S.Ct. at 2510–11. The nonmovant "must do more than simply show that there is some metaphysical doubt as to the material facts.... Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.' " *Matsushita Electric Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1355–56, 89 L.Ed.2d 538 (1986) (citations omitted). An issue is not genuine if it is unsupported by evidence, or if it is created by evidence that is "merely colorable" or is "not significantly probative." *Anderson*, 477 U.S. at 249–50, 106 S.Ct. at 2510–11. Thus, to survive a motion for summary judgment, the non-moving party must come forward with specific evidence of *every* element material to that party's case so as to create a genuine issue for trial.

---

5. The non-moving party may meet its burden through affidavit and deposition testimony, answers to interrogatories, and the like. *Celotex*, 477 U.S. at 324, 106 S.Ct. at 2553.

III. *The ex parte Guardianship Hearing of June 19, 1989.*

A. *Introduction.*

On June 19, 1989, the Hospital Authority, acting through its attorneys, W. Grady Pedrick and Jerry A. Landers, petitioned the Cobb County Superior Court for an *ex parte* guardianship hearing in order to determine whether a guardian *ad litem* should be appointed on behalf of plaintiff Gregory Novak. Such petition was entered at the direction of the Hospital Authority's employee, Samuel D. Bishop.[6] As noted *supra,* Bishop had learned that Gregory Novak was suffering from an extremely low blood count and that his medical condition could, at any moment, deteriorate quickly enough to require an immediate blood transfusion in order to save his life. (Dep. of Samuel D. Bishop at 64, 79–80). Mr. Bishop was also aware that Gregory was a Jehovah's Witness and that the Hospital Authority's attorneys were being involved "in reference to a minor and that [a] blood transfusion was apparently the issue according to the medical staff" when he met the attorneys at the Cobb County Courthouse to present the petition seeking the appointment of a guardian for Gregory. *Id.* at 80–1. It is undisputed that neither of the plaintiffs had notice of this hearing and neither of the plaintiffs were present when the hearing was conducted.

Although the plaintiffs' pleadings are not entirely clear, it appears that, as predicates for their § 1983 claims, they have alleged substantive and procedural due process violations for a deprivation of both plaintiffs' liberty interest in freedom from interference with familial relationships. Defendants concede that familial relationships are protected by the Fourteenth Amendment; however, defendants argue that plaintiffs were not deprived of these rights without due process. Accordingly, the Court will examine the implications of the Hospital Authority's petition for a guardianship hearing under both a sub-

stantive due process and a procedural due process analysis.

B. *Substantive Due Process.*

"Substantive due process prohibits the government from engaging in certain activity regardless of the procedure used to implement that activity." *Bendiburg v. Dempsey,* 909 F.2d 463, 468 (11th Cir.1990). "In a substantive due process claim, we are concerned with those rights which the state may not take away." *Taylor v. Ledbetter,* 818 F.2d 791, 794 (11th Cir.1987). However, "not every wrong committed by a state actor rises to the level of a 'constitutional tort', sufficient to trigger a substantive due process violation." *Lee v. Hutson,* 810 F.2d 1030, 1032 (11th Cir.1987). In order for substantive due process to be violated, the state action must "shock[ ] the conscience" of the court. *See, Bendiburg v. Dempsey,* 707 F.Supp. 1318, 1324 (N.D.Ga.1989) (Forrester, J.), *aff'd in pertinent part,* 909 F.2d at 468.

 It is well settled, and the parties do not dispute, that governmental intrusion into and interference with familial relationships between a parent and child can rise to the level of a substantive due process violation. *See Santosky v. Kramer,* 455 U.S. 745, 753, 102 S.Ct. 1388, 1394, 71 L.Ed.2d 599 (1982); *Quilloin v. Walcott,* 434 U.S. 246, 255, 98 S.Ct. 549, 554–55, 54 L.Ed.2d 511 (1978); *Moore v. City of East Cleveland,* 431 U.S. 494, 499, 97 S.Ct. 1932, 1935, 52 L.Ed.2d 531 (1977); *Stanley v. Illinois,* 405 U.S. 645, 651–52, 92 S.Ct. 1208, 1212–13, 31 L.Ed.2d 551 (1972); *Prince v. Massachusetts,* 321 U.S. 158, 166, 64 S.Ct. 438, 442, 88 L.Ed. 645 (1944); *Meyer v. Nebraska,* 262 U.S. 390, 399–400, 43 S.Ct. 625, 626–27, 67 L.Ed. 1042 (1923). "While '[d]efining the exact scope of a substantive due process claim is by its nature an imprecise task,' *Fundiller v. City of Cooper City,* 777 F.2d 1436, 1440 (11th Cir.1985), it is known that violations giving

6. The record is somewhat unclear as to who first contacted the Hospital Authority's attorneys when court intervention was sought in the treatment of Gregory Novak. Dr. Henderson testified that he contacted Mr. Bishop who in turn contacted the Hospital attorneys. Mr. Bishop and the Hospital attorneys testified that Dr. Henderson contacted the attorneys directly who

in turn contacted Mr. Bishop. It is irrelevant to this decision whether it was Mr. Bishop or Dr. Henderson who contacted the Hospital attorneys. What is relevant to this decision is what Mr. Bishop and the attorneys knew about Gregory Novak's medical condition at the time they sought the *ex parte* guardianship hearing.

rise to such claims are necessarily more egregious than those which give rise to simple tort actions." *Bendiburg,* 707 F.Supp. at 1324, *aff'd in pertinent part,* 909 F.2d at 468 (citing *Gilmere v. City of Atlanta,* 774 F.2d 1495, 1500 (11th Cir.1985)).

■ In *Bendiburg,* the district court held that the transfer of legal custody of a fifteen year old child for a period of five days so that the child could receive medical treatment against the wishes of his father, which treatment arguably resulted in the child's death, did not constitute the requisite "shocking or egregious" conduct necessary to "suggest that defendants' actions were taken for the purposes of oppression." *Bendiburg,* 707 F.Supp. at 1324, *affirmed in pertinent part,* 909 F.2d at 468. In the case currently before this Court, legal custody of the child was never removed from his mother, June Novak. A guardian *ad litem* was appointed for the limited purpose of making a best interest determination regarding the need for Gregory to receive a blood transfusion. Although the plaintiffs' familial relationship was intruded upon to the extent that the guardian was permitted to act in June Novak's stead, the Court finds the intrusion to be less substantial than that which existed in *Bendiburg.* Moreover, the Court just does not find the state actor's actions arose to the requisite shocking and egregious conduct necessary for a substantive due process violation. Thus, the Court holds that no substantive due process violation occurred with respect to the government's intrusion into the plaintiffs' familial relationship.

### C. Procedural Due Process.

■ Constitutional procedural due process acts to safeguard expectations created by state law. *Taylor,* 818 F.2d at 794. Such claims challenge the constitutional adequacy of the procedures employed by the state in determining how to treat individuals in a specific case. *Gilmere,* 774 F.2d at 1500. A party bringing a procedural due process

claim must demonstrate that there has been (1) a deprivation in the constitutional sense, and (2) that the procedures employed by the state to effect this deprivation were constitutionally inadequate. *Smith v. Organization of Foster Families for Equality & Reform,* 431 U.S. 816, 847, 97 S.Ct. 2094, 2111, 53 L.Ed.2d 14 (1977).

■ As noted previously, both a parent and a child have a liberty interest in their familial relationship that is entitled to constitutional protection. *Bendiburg,* 707 F.Supp. at 1325, *aff'd in pertinent part,* 909 F.2d at 468. *See also Duchesne v. Sugarman,* 566 F.2d 817, 825 n. 19 (2d Cir.1977) (parent and child hold reciprocal rights to family integrity). Thus, the appointment of a guardian *ad litem* for Gregory created a deprivation in the constitutional sense, with respect to both plaintiffs. The family is not beyond regulation in the public interest, however, nor are rights of parenthood beyond limitation. *Prince,* 321 U.S. at 166–167, 64 S.Ct. at 442. The right to practice religion and make parental decisions does not include the liberty to expose a child to ill health or death. *Id.* "It is equally well established ... that a state has a legitimate ... interest in the health, safety and welfare of the children within its borders." *Bendiburg,* 707 F.Supp. at 1325, *aff'd in pertinent part,* 909 F.2d at 468 (citing *Stanley v. Illinois,* 405 U.S. 645, 652, 92 S.Ct. 1208, 1213, 31 L.Ed.2d 551 (1971)). In seeking the appointment of a guardian, the Hospital Authority sought to promote that legitimate interest, and the interests of the individuals and the state, accordingly, came into conflict.

Plaintiffs argue that at the time these interests came into conflict—that is, at the hearing to appoint a guardian—they were not afforded procedural due process due to their lack of notice and opportunity to be heard prior to the court's action.[7] Thus, plaintiffs are complaining of the absence of

---

7. Plaintiffs have argued that pursuant to O.C.G.A. §§ 15–11–6 and 29–4–4.1 they both had an absolute right to notice and opportunity to be heard prior to the appointment of a guardian *ad litem* under Georgia law. However, the court was petitioned to intervene pursuant to its power to act on an *ex parte* basis in a medical emergency, as provided in O.C.G.A. § 15–11–32. Mr.

Ingram was appointed Gregory's guardian *ad litem* in order to "investigate the questions raised" by June Novak's continued refusal to consent to blood transfusions for her son. Although it is not clear from the record, it appears the appointment of a guardian *ad litem* was accomplished to assist the court in exercising its powers under O.C.G.A. § 15–11–32.

predeprivation notice. Plaintiffs correctly note that in most cases involving state interference in the familial relationship, the state must provide an opportunity to be heard prior to the state intrusion. *In re: Gault*, 387 U.S. 1, 31–4, 87 S.Ct. 1428, 1445–47, 18 L.Ed.2d 527 (1967). However, "under certain extraordinary circumstances, a parent's custodial rights may be temporarily terminated without notice, provided a meaningful post-deprivation remedy is ... available." *Bendiburg*, 909 F.2d at 467.

■■■■■ Defendants assume that plaintiffs had adequate post-deprivation remedies and, thus, the lack of predeprivation notice does not constitute a deprivation of procedural due process.[8] Post-deprivation remedies are never favored, however, and are constitutionally inadequate unless predeprivation remedies are unavailable or impracticable. *Logan v. Zimmerman Brush Co.*, 455 U.S. 422, 436, 102 S.Ct. 1148, 1158, 71 L.Ed.2d 265 (1982). Here defendants argue that predeprivation notice of the June 19, 1989 hearing was unavailable due to the emergency created by Gregory Novak's medical condition. Thus, as in *Bendiburg*, "the court must determine whether plaintiff[s] ha[ve] identified and presented specific evidence calling into question the need—*real or perceived*—to forego pre-

deprivation procedures." 707 F.Supp. at 1326, *aff'd in pertinent part*, 909 F.2d at 468 (emphasis added). *See also Franco v. Moreland*, 805 F.2d 798, 801 n. 1 (8th Cir.1986) (post-deprivation process is adequate for administrative segregation of prisoner if prisoner is a danger to himself or others and actions must be taken immediately to protect same); *Hooks v. Hooks*, 771 F.2d 935, 942 (6th Cir.1985) (in emergency situation, post-deprivation process is adequate for initial removal of children from parental custody) (citing *Ewing v. Mytinger & Casselberry, Inc.*, 339 U.S. 594, 599, 70 S.Ct. 870, 873, 94 L.Ed. 1088 (1950); and *Boddie v. Connecticut*, 401 U.S. 371, 379, 91 S.Ct. 780, 787, 28 L.Ed.2d 113 (1971)). However, unlike in *Bendiburg*, this Court finds that plaintiffs have not identified and presented such evidence.[9]

The district court in *Bendiburg* denied summary judgment to the Department of Family and Children Services ("DFACS") because the plaintiffs in that case presented a question of fact with respect to the existence of a medical emergency, "whether ... real or perceived", which necessitated an *ex parte* hearing. *Bendiburg*, 707 F.Supp. at 1326, *aff'd in pertinent part*, 909 F.2d at 468.

---

**8.** There is no absolute measure of what process is due in any given case. Rather, in determining the sufficiency of post-deprivation remedies, the possibility of error in the absence of predeprivation notice must be weighed against the public interest the state seeks to protect. *Parratt v. Taylor*, 451 U.S. 527, 538, 101 S.Ct. 1908, 1914, 68 L.Ed.2d 420 (1981). If a medical emergency was perceived by the state actor, then the possibility of error must be weighed against the state's interest in preserving the life of the children within its borders. Plaintiffs do not argue that their post-deprivation remedies were inadequate. They limit their argument to the lack of necessity for an *ex parte* hearing. Similarly, the Defendants' arguments have assumed adequate post-deprivation remedies and have concentrated on the need for the *ex parte* hearing. Since the burden of pleading and proving inadequacy of the process employed by the state is on the plaintiff, *Collins v. King*, 743 F.2d 248 (5th Cir. 1984), and plaintiffs have not done so with respect to the available post-deprivation remedies, the Court is not required to decide the adequacy of plaintiffs' post-deprivation remedies. However, the Court does find that, if the state actor perceived that a medical emergency existed at the time the state actor sought the *ex parte* relief, plaintiffs' ability to seek immediate dissolution of

the temporary guardianship pursuant to O.C.G.A. § 29–4–4.1(c), as they did on July 3, 1989, and to pursue state tort law remedies are adequate post-deprivation remedies given the gravity of the state interest in the preservation of the life of a child.

**9.** For purposes of this analysis, the Court will assume, without deciding, that defendant Samuel D. Bishop either acted pursuant to the Hospital Authority's established policy or custom or acted as a policymaker when he and the Hospital attorneys pursued an *ex parte* guardianship hearing on behalf of the Hospital Authority. The Hospital Authority argued in its briefs that even if defendant Bishop acted in such a way as to cause a constitutional deprivation, the Hospital Authority would still be entitled to Summary Judgment unless he was acting pursuant to an established policy or was acting as a policymaker for the Hospital Authority when he took action. There is no need for this Court to reach the "policymaker" issue with respect to the decisions made by defendant Bishop on behalf of the Hospital Authority as the decision to grant all defendants' motions for summary judgment is based on a finding that no constitutional violation occurred as a result of Mr. Bishop's actions.

The situation presented in this case is analogous to that presented in *Bendiburg*; however, there is a significant factual distinction that warrants a conclusion opposite to that reached in *Bendiburg*.

In *Bendiburg*, the DFACS worker testified that she sought the *ex parte* order because she had been told by medical personnel treating the child that the child "would either die ... or lose his leg" if he did not receive the treatment in question. *Id.* at 1335. The testimony of the medical personnel did not corroborate the DFACS employee's testimony, however. *Bendiburg*, 707 F.Supp. at 1335–36 and 1339–40; *Bendiburg v. Dempsey*, No. 87–CV–1774, at 9 (N.D.Ga. June 30, 1989) (Forrester, J.) (order granting in part and denying in part defendants' motions for summary judgment) at 1335–36 and 1339–40. In fact, when the treating physician who performed the surgery was questioned about the child's need for the procedure in question, he testified "I wouldn't classify it as emergency. I'd classify it as necessary." *Id.* at 1340. Moreover, at the time the child's father decided not to pursue the treatment, the same physician had "no problem" with the decision due to the dangers of the procedure and available alternative treatments. *Id.* at 1322. Thus, the deposition testimony of at least some of the medical personnel treating the minor in the *Bendiburg* case was inconsistent with the deposition testimony of the DFACS employee who sought the *ex parte* order and consented to the treatment. Accordingly, an issue of fact was presented regarding whether the State Actor perceived that an emergency, which would warrant an *ex parte* hearing, existed.

 In this case, however, the plaintiffs have pointed this Court to no specific evidence that would tend to raise an issue of fact with respect to what Mr. Bishop knew or believed when he and the attorneys sought the *ex parte* guardianship order on June 19, 1989. That is, the undisputed evidence shows that the state actor, defendant Bishop, believed there was an emergency situation triggering the need for a court to intercede on the child's behalf. Plaintiffs *do not offer* evidence to contradict the existence of this belief on defendant Bishop's part. All the evidence in the record supports the conclusion that defendant Bishop believed that he was acting in an emergency medical situation.

Dr. Henderson's affidavit in support of the guardianship petition was prepared by the Hospital attorneys and taken by Mr. Bishop to Dr. Henderson for signature. (Dep. of W. Grady Pedrick, Jr. at 49–50; Dep. of Samuel D. Bishop at 74–77). This affidavit, signed by Dr. Henderson in support of the guardianship petition, stated that:

3.

I performed surgery on the minor patient, and as a consequence of the numerous cuts and the fractured thigh, as a further consequence of the surgery itself, the patient sustained a substantial loss of blood. At present, 3:45 p.m., June 19, 1989, *the patient has a dangerously low blood count.*

4.

It is my considered medical opinion that the life of the patent [sic] may very well be in danger, and that if the blood count falls lower and he becomes hypotensive, *a blood transfusion will be necessary in order to save the life of the patient.*

*Cobb County Kennestone Hospital Authority v. Novak*, No. 89–14011–99 (Super.Ct. of Cobb County, Georgia 1989) (Aff. of Bradley E. Henderson, M.D. at 1–2) (emphasis added). Similarly, in his deposition, Dr. Henderson testified that he told Mr. Bishop that "from a medical standpoint, ... [Gregory] was a Jehovah's Witness minor with *acute blood loss.*" (Dep. of Bradley E. Henderson at 65 (emphasis added)). Likewise, defendants Pedrick, Landers and Bishop all testified that they understood they were acting in an emergency situation. (Dep. of W. Grady Pedrick at 49 ("true emergency existed ... late in the afternoon of [June] 19th")); (Dep. of Jerry A. Landers at 96 ("I understood that it was an emergency situation and that was the only reason that we had become involved in the case at all.")); (Dep. of Samuel D. Bishop at 64 (the hospital sought court intervention "because he [Gregory] was a minor and the attending doctor said he was in a life threatening situation and he needed blood"), 79 ("the doctors felt that it was a life threatening situation") and 80 ("I knew we had a minor in the [Intensive Care

Unit] that attending physicians were saying was in a life threatening situation and needed ... blood")).

Moreover, less than two hours passed from the time that Dr. Henderson's Affidavit was drafted until the time Mr. Ingram was appointed guardian *ad litem. See* Affidavit of Bradley E. Henderson, M.D. at 1 (present time is 3:45 p.m., June 19, 1989) *and Cobb County Kennestone Hospital Authority v. Novak,* No. 89–14011–99 (Super.Ct. of Cobb County, Georgia June 19, 1989) (order appointing guardian *ad litem* filed by clerk's office at 5:39 p.m., June 19, 1989). Thus, the documents were drafted, Dr. Henderson's signature was obtained, the hearing was held and the order was entered and filed in less than 120 minutes. The Court finds this flurry of activity to be highly corroborative of Mr. Bishop's testimony that he perceived an emergency existed. There simply is no factual issue presented in this record regarding defendant Bishop's belief that he was acting in the face of a medical emergency.

Plaintiffs make several arguments in support of their position that those acting on behalf of the Hospital Authority were not acting pursuant to a medical emergency. Plaintiffs cite to three types of evidence to support their argument: (1) the treatment records prepared by Gregory Novak's doctors at the time of his treatment[10]; (2) the testimony of plaintiffs' expert witnesses; and (3) the passage of time between when defendant Bishop, and the Hospital Authority's attorneys, petitioned the court for *ex parte* relief and when the blood transfusion was ultimately administered to Gregory on June 20, 1989.[11]

█ Plaintiffs' arguments in this regard do not address defendant Bishop's perceptions at the relevant time, which was the afternoon of June 19, 1989.[12] Plaintiffs appear to be arguing that the state actor must be correct in his belief that an emergency exists in order for him to have comported with the Constitution's procedural due process requirements.[13] This argument sweeps

10. Plaintiffs cite to isolated words and phrases in Gregory's medical records which, if read out of context, suggest a more optimistic assessment of Gregory's situation. However, when read in context with the medical records as a whole, the records clearly indicate that Gregory could have been subject to dire consequences at any moment, due to his acute loss of blood. Moreover, plaintiffs have not indicated that defendants Bishop, Pedrick and Landers, who are not doctors, would have been in any position to interpret or refute these records had they read them.

11. Plaintiffs also argue that the delay in notice to the guardian that he had been appointed as such until approximately 9:30 on the morning of June 20, 1989 (Dep. of Robert D. Ingram at 38) indicates that Defendant Bishop knew he was not acting under emergency circumstances on June 19. Upon review of all the testimony on this topic, however, it appears that Mr. Bishop had little or no opportunity to know who had been appointed guardian *ad litem* until the morning of June 20. He characterized his role as that of a "messenger boy" carrying documents from place to place and then meeting the attorneys at the courthouse. (Dep. of Samuel D. Bishop at 78). When he arrived at the courthouse the attorneys were already in Judge Hines' chambers. *Id.* at 77–8. Upon delivering Dr. Henderson's affidavit in support of the Hospital Authority's petition, Mr. Bishop received no further instructions from the attorneys that evening. *Id.* at 77–8, 206–7; (Dep. of W. Grady Pedrick at 88); (Dep. of Jerry A. Landers at 48–9). Plaintiffs infer that some possible neglect in notifying Mr. Ingram of his appointment on June 19, 1989, on the part of the

attorneys or Judge Hines, indicates that Mr. Bishop knew he was not acting in an emergency situation. This Court is not willing to impute such knowledge to Mr. Bishop on such a slender thread, however.

12. Whether Dr. Henderson was correct in his assessment that a medical emergency existed is irrelevant to the determination of what the defendant state actor knew or believed at the time he acted. The relevant determination must focus on the state actor's perceptions at the pertinent times. Moreover, as discussed *infra,* plaintiffs' assertions that Dr. Henderson and/or the other private actors may have exaggerated Gregory Novak's emergency as part of a conspiracy to induce the Hospital Authority to seek an *ex parte* guardianship hearing is unsubstantiated in the record.

13. The Court does not reach the issue of whether Dr. Henderson's assessment and communication that Gregory Novak was in emergency need of medical care to which his mother would not · consent was in fact correct in hindsight, as it does not bear on the issue of what defendant Bishop perceived to be the situation on the afternoon of June 19, 1989. The Court does note, however, that all three of Gregory's treating physicians made entries in Gregory's medical records that indicated life-threatening consequences were possible as a result of June Novak's continued refusal to allow her son to receive a blood transfusion. The Court is further impressed by the fact that Plaintiffs' own medical expert testified that, in his opinion, a blood transfusion

much broader than the reasoning in *Bendiburg*, wherein the Eleventh Circuit stated that "[t]he validity of the temporary custody order ... for ... constitutional purposes, turns on whether such an emergency existed, *or was thought to exist by the state employees*, so as to make constitutional what would be unconstitutional in the absence of a medical emergency." 909 F.2d at 468 (emphasis added).[14]

The state actor and the attorneys in this case were lay people who "were in no position to reject the doctors' characterization of [Gregory's] condition. The fact that [the] transfusion was not immediately required does not negate the emergency nature of [his] situation." *Niebla v. County of San Diego*, 1992 WL 140250 at \*4, 1992 U.S.App. LEXIS 15049 at \*12 (9th Cir.1992).[15] "The fact the case was heard by an impartial judge was sufficient to meet the requirements of due process in this case." *Staelens v. Yake*, 432 F.Supp. 834, 839 (N.D.Ill.1977). Thus, the Court concludes, based on the record before it at this time, that plaintiffs have failed to point to any specific evidence that raises a genuine issue of fact with respect to their procedural due process claims pursuant to the events leading up to the issuance of the *ex parte* guardianship order on June 19, 1989.

### D. Freedom of Religion.

Both plaintiffs alleged violations of their First Amendment right to freedom of religion as alternative grounds upon which to base their § 1983 claims. Plaintiff Gregory Novak has argued that he was denied his right to refuse a blood transfusion in the exercise of his First Amendment right to freedom of religion. Any potential infringement to Gregory Novak's First Amendment right to freedom of religion is discussed in regard to his being forced to receive a blood transfusion against his will on June 20, 1989, *infra.*

Plaintiff June Novak alleged a violation of her First Amendment right to freedom of religion in Count 13 of the plaintiffs First Amended Complaint. However, she has since abandoned this claim and, thus, the Court finds that there is no continuing dispute with respect to plaintiff June Novak's First Amendment rights.[16] (Pls.' Joint Mem. of Law in Opp'n to Defs.' Motions for Summ.J. at 23). "In fact, as far as Plaintiffs are concerned, June Novak's religious freedom is not an issue in this case." *Id.*

---

would be "medically indicated" and "appropriate" for a patient with a hemoglobin reading as low as Gregory Novak's was on June 19, 1989. (Dep. of William H. Pogue at 95, 109–111). Furthermore, this same expert testified that fully 90 or 98 percent of physicians faced with the facts at Dr. Henderson's disposal would have ordered a transfusion. *Id.*

14. Moreover, the Court notes, by analogy, that a mistaken identity arrest does not result in the attachment of § 1983 liability against a state actor for deprivation of the detainee's liberty without due process unless the innocent person is detained beyond the time when "it was or should have been *known* that the detainee was entitled to release." *Cannon v. Macon County*, 1 F.3d 1558, 1563 (11th Cir.1993) (emphasis added) (citing *Sivard v. Pulaski County* 959 F.2d 662 (7th Cir.1992) (continued detention where sheriff *knew* it was wrongful states claim under § 1983 for due process violation); *Sanders v. English*, 950 F.2d 1152 (5th Cir.1992) (failure to release after officer *knew or should have known* that plaintiff had been misidentified gives rise to cause of action under § 1983)).

15. Although the *Niebla* case is an unreported Ninth Circuit opinion, it is factually very similar to the case at bar and the Court finds it to be persuasive. In the *Niebla* case, the county officials sought and received an emergency *ex parte* custody and blood transfusion order on the morning of March 11, 1989, but the child, who was a fifteen year old Jehovah's Witness, was not ultimately transfused until a week later. In the present case, approximately twenty hours passed between when the *ex parte* guardianship petition was granted and when Gregory was transfused. Plaintiffs argue that this delay presents an issue of fact regarding the need for *ex parte* relief on the afternoon of June 19, 1989. While the delay might be probative with regard to the accuracy of Dr. Henderson's assessment of the situation, the Court finds it of little probative value with respect to the perceptions of the state actor at the time he acted.

16. Alternatively, the Court finds *Prince v. Massachusetts*, 321 U.S. 158, 64 S.Ct. 438, 88 L.Ed. 645 (1944), dispositive of any deprivation of religious freedom claim June Novak may have with respect to the June 19, 1989 hearing. In *Prince*, the Supreme Court firmly established that a parent's religious freedom is subordinate to the state's interest in preserving the health and welfare of the children within its borders.

*E. Plaintiffs' Remaining Constitutional Claims.*

In their complaint, plaintiffs alleged additional constitutional violations by the defendants as predicates for their § 1983 claims. *See* First Am.Compl. at 8–10 (Gregory Novak asserts violations of the privileges and immunities clause and equal protection clauses of the Fourteenth Amendment and contract clauses of the Fifth and Fourteenth Amendments) and 26–28 (June Novak asserts violations of the privileges and immunities and equal protection clauses of the Fourteenth Amendment). Defendants have argued that there is no factual basis to assert these additional constitutional claims. Plaintiffs have provided no factual support or argument with respect to the privileges and immunities and contract claims. Plaintiffs have provided very limited argument with respect to Gregory Novak's equal protection claim and none with respect to June Novak's equal protection claim.

■■■■■■ In order for there to have been a violation of equal protection, there must be evidence that similarly situated persons were treated differently by the state. *Zeigler v. Jackson*, 638 F.2d 776 (5th Cir.1981).[17] Unequal application by the state of a facially neutral law will support an equal protection claim. *Id.* Plaintiffs have neither alleged nor directed this Court's attention to any factual basis for their equal protection claims. They have failed to allege how they were treated differently from others similarly situated. Similarly they have failed to direct this Court's attention to any factual support for such a finding.

Upon a complete review of the record, the Court has found no factual allegations or evidence which tends to support any of these alleged additional constitutional violations. Thus, the Court finds that plaintiffs have suffered no deprivation of the interests protected by the cited clauses of the Constitution due to any of the events of June 19 and 20, 1989.

## IV. *The Hearing of June 20, 1989.*

■■■■ On June 20, 1989, a hearing was held at Kennestone Hospital regarding "the matter of Gregory Alan Novak." (Tr. of proceedings before the Honorable P. Harris Hines, June 20, 1989 at 2). Judge Hines called the hearing *sua sponte* upon learning that Mr. Bishop had been advised by Dr. Tucker that Gregory's condition had deteriorated further during the night. (Dep. of Samuel D. Bishop at 107, 119, 121; Aff. of Samuel D. Bishop at ¶ 8; Certified copies of excerpts from medical records for Gregory Novak at 16, attached as Ex. A of Defs.' Bishop and Hospital Authority). During this conversation, Judge Hines "informed [Mr. Bishop] that he was on the way to the hospital, and asked [Mr. Bishop] to have the doctors and the hospital attorneys present for this hearing." (Dep. of Samuel D. Bishop at 107). Plaintiffs do not dispute that it was Judge Hines who initiated this hearing and determined who should be in attendance. (Pls.' Joint Mem. of Law in Opp'n. to Defs.' Motions for Summ. J. at 10–11).

Plaintiffs appear to make all the same constitutional claims with respect to this hearing as they did with respect to the hearing held on June 19, 1989. However, the Court finds that this hearing is no more constitutionally infirm than the hearing on the nineteenth.[18] The same emergency conditions existed on the morning of June 20 as had existed the evening before. If anything, the emergency had escalated during the night.

Plaintiffs rely on the delay in administering the blood transfusion as evidence that no emergency existed on the morning of June 20, 1989.[19] Plaintiffs assert that the approxi-

---

**17.** In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir.1981) (en banc), the Eleventh Circuit Court of Appeals adopted as binding precedent all of the decisions of the former Fifth Circuit Court of Appeals handed down prior to the close of business on September 30, 1981.

**18.** Although plaintiffs' pleadings are not clear in this issue, they seem to allege both substantive and procedural due process violations with respect to the hearing on June 20, 1989. For all the same reasons stated in the discussion regard-

ing the hearing on June 19, 1989, the Court finds no substantive due process violation resulted from Mr. Bishop's additional activities on June 20. Thus, the discussion regarding the hearing of June 20, 1989 is limited to potential procedural due process violations.

**19.** Plaintiffs have also referred to the testimony of their expert witnesses in support of their assertion that no medical emergency existed at any time on June 19 and 20, 1989. As noted previously, this evidence is relevant to the determina-

mately four hour delay from the time the June 20 hearing began until the blood transfusion actually began indicates that Gregory was not, in fact, in emergent need of a blood transfusion. However, Dr. Henderson ordered the blood transfusion immediately following the hearing. (Dep. of Bradley E. Henderson at 98, 116). Dr. Henderson left the hospital immediately after ordering the blood transfusion and did not return until approximately 6:00 that evening. *Id.* at 102, 116. The blood transfusion order was unequivocal when issued. *Id.* at 116. Plaintiffs have pointed this Court to no evidence that would indicate that Dr. Henderson intended *any* delay when he issued his transfusion order.

Dr. Tucker first became aware of the delay when he checked on Gregory sometime later. (Dep. of John David Tucker at 61). Upon further investigation, Dr. Tucker learned that Dr. Gray had specified leukocyte poor blood for the transfusion and that such specification was responsible for the delay. *Id.* at 60–61; (Dep. of Richard Gray at 88). Plaintiffs have repeatedly attempted to characterize the delay as one caused by the doctors waiting to issue the medical treatment order. There is no factual basis in the record to support this characterization, however. The undisputed testimony is that Dr. Henderson ordered the transfusion immediately following the hearing and, due to the additional filtering at Dr. Gray's request, the transfusion did not actually occur until approximately four hours later.

Plaintiffs also argue that predeprivation notice and opportunity to be heard were not impracticable, regardless of whether an emergency existed, because June and Gregory Novak were at the hospital at the time the hearing was conducted. As plaintiffs' argument goes, their presence in the hospital resulted in a constitutional violation because an *ex parte* hearing was not necessary under the circumstances. Plaintiffs' argument in this regard must fail for two alternative reasons.

Plaintiffs ignore the fact that Gregory Novak's guardian *ad litem* was present at the hearing on June 20. As Gregory's guardian *ad litem*, defendant Ingram was "responsible to the minor for his conduct in connection with the litigation *in the same manner as if he were a regularly qualified guardian.*" O.C.G.A. § 29–4–7 (1993) (emphasis added). Mr. Ingram had a "duty to exercise diligence to protect the interests of his ward in all matters relating to the litigation." *Speck v. Speck,* 42 Ga.App. 517, 156 S.E. 706 (1931). Mr. Ingram's participation in the hearing of June 20, 1989 was in the place of Gregory's mother, O.C.G.A. § 29–4–7, due to the "possibility that the minor's interest might be adverse to those of his parent." *Cobb County Kennestone Hospital Authority v. Novak,* No. 89–14011–99 (Super.Ct. of Cobb County, Georgia, June 19, 1989) (order appointing Robert D. Ingram to act as guardian *ad litem* to assist the court in its determination of Gregory Novak's medical needs). Thus, the Court finds that the June 20, 1989 hearing was not held on an *ex parte* basis due to the presence of Gregory Novak's guardian *ad litem.*

█ Moreover, even had no guardian been present, resulting in an *ex parte* hearing, the state actor defendant was not responsible for determining who should be present at the hearing. Judge Hines' decided to call the hearing and it was he who directed Mr. Bishop as to who should be in attendance. In order for § 1983 liability to attach plaintiffs must prove "an affirmative causal connection between the actions taken by a particular person 'under color of state law' and the constitutional deprivation." *Williams v. Bennett,* 689 F.2d 1370, 1380 (11th Cir.1982). "The causation requirement of section[ ] 1983 ... is not satisfied by a showing of mere causation in fact. Rather, the plaintiff must establish proximate or legal causation." *Arnold v. International Business Machines Corp.,* 637 F.2d 1350, 1355 (9th Cir.1981) (citation omitted).

tion of whether, in some absolute sense, Gregory's doctors were correct in their respective medical opinions. This evidence is of no value with respect to what Mr. Bishop knew or believed at the time. Moreover, as discussed previously,

plaintiffs have directed this Court to no evidence which would tend to support their allegation that the defendants conspired to invent a medical emergency to enable them to seek *ex parte* access to the court.

Thus, while Mr. Bishop's conversation with Judge Hines may have been the cause of Judge Hines' decision to call the hearing on June 20, 1989, there is no evidence to indicate that he in any way influenced Judge Hines' in the latter's failure to include either of the plaintiffs in the hearing. Therefore, the Court concludes that, to the extent plaintiffs may have suffered any constitutional deprivation due to their exclusion from the hearing on June 20, 1989, such deprivation was not *caused* by any of the defendants in this case. Rather, Judge Hines' direction to Mr. Bishop as to who to have present at the hearing was the legal cause of plaintiffs' exclusion from the hearing of June 20, 1989.

## V. *The Blood Transfusion on June 20, 1989.*

Although the plaintiffs' pleadings are not entirely clear, it appears that they have alleged due process violations for a deprivation of Gregory Novak's liberty interests in bodily self-determination, freedom from unnecessary pain and freedom from unnecessary confinement to receive medical care, as well as a violation of his freedom of religion, as a result of his being forced to receive a blood transfusion. Plaintiffs also argue that Gregory Novak, as a "mature minor", was denied his procedural due process rights to refuse medical care under Georgia law.

Defendants argue that any constitutional interest in bodily self-determination Gregory Novak may have possessed did not include the right to refuse medically necessary treatment and that Georgia law includes no provision for "mature minors" to refuse medical treatment. Defendants concede that Gregory Novak, as a minor, was possessed of the liberty interests of freedom from unnecessary pain and freedom from being confined unnecessarily to receive medical treatment; however, defendants argue that he was not deprived of these rights, as he was afforded due process prior to being subjected to involuntary confinement for treatment.

### A. *Substantive Due Process and Freedom of Religion.*

 Plaintiffs assert that Gregory Novak had an absolute right to refuse medical treatment as a part of his right to privacy. Moreover, plaintiffs assert that by denying him the right to refuse unwanted medical treatment, his First Amendment right to freedom of religion has also been violated. The issues presented with respect to plaintiff Gregory Novak's purported right to refuse a blood transfusion are somewhat complex. The Court agrees with plaintiffs' argument that an individual's constitutional rights do not instantly appear upon an individual reaching the age of majority. *Planned Parenthood of Cent. Missouri v. Danforth,* 428 U.S. 52, 74, 96 S.Ct. 2831, 2843, 49 L.Ed.2d 788 (1976); *In re Gault,* 387 U.S. 1, 13, 87 S.Ct. 1428, 1436, 18 L.Ed.2d 527 (1967). Further, the Court agrees that minors have some level of constitutional protection with respect to religious freedom, *West Virginia State Board of Education v. Barnette,* 319 U.S. 624, 63 S.Ct. 1178, 87 L.Ed. 1628 (1943), and have "a substantial liberty interest in not being confined unnecessarily for medical treatment." *Parham v. J.R.,* 442 U.S. 584, 600, 99 S.Ct. 2493, 2503, 61 L.Ed.2d 101 (1979). However, plaintiffs have cited no authority for the proposition that a sixteen year old "mature minor" has a constitutional right to refuse a blood transfusion pursuant to either the minor's First or Fourteenth Amendment rights; nor could they.

The plaintiffs' citation to cases holding that a competent adult has the right to refuse unwanted medical treatment and that minors have a constitutional right to consent to an abortion are inapposite. *See, Cruzan v. Director, Missouri Dep't of Health,* 497 U.S. 261, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990) (Supreme Court assumed *arguendo* that right to privacy includes right of mentally competent adult to refuse unwanted medical treatment); *Planned Parenthood of Cent. Missouri v. Danforth,* 428 U.S. 52, 96 S.Ct. 2831, 49 L.Ed.2d 788 (1976) (abortion statute provision requiring written consent of parents to abortion of unmarried woman under eighteen during first 12 weeks of pregnancy unless physician certifies that abortion is necessary to preserve mother's life is unconstitutional). Gregory Novak was an adult at no time relevant to the determination of the motions currently before this Court. Moreover, the unique constitutional considerations surrounding procreative decisions are not presented in this case.

Contrary to the position plaintiffs urge this Court to take, the Supreme Court has stated that "[m]ost children, *even in adolescence,* simply are not able to make sound judgments concerning many decisions, *including their need for medical care or treatment.* Parents can and *must* make those judgments." *Parham,* 442 U.S. at 603, 99 S.Ct. at 2505 (emphasis added). Under the circumstances presented in this case, defendant Robert Ingram stood in the shoes of Gregory's mother, O.C.G.A. § 29–4–7, for the limited purpose of determining whether a blood transfusion was in Gregory's medical best interest. *Cobb County Kennestone Hospital Authority v. Novak,* No. 89–14011–99 (Super.Ct. of Cobb County, Georgia, June 19, 1989) (order appointing Robert D. Ingram guardian *ad litem* for Gregory Novak). As noted previously, "[i]t has been firmly established that courts can order compulsory medical treatment of children for any serious illness or injury ... [a]nd there are no religious exemptions from these orders." *Application of President and Directors of Georgetown College, Inc.,* 331 F.2d 1000, 1007–8 (D.C.Cir.1964) (citations omitted). Not even a parent has unbridled discretion to exercise their religious beliefs when the state's interest in preserving the health of children within its borders weighs in the balance. *Prince,* 321 U.S. at 166–67, 64 S.Ct. at 442. Thus, the Court finds that Gregory Novak had no substantive due process right to refuse unwanted medical care.

Alternatively, to the extent Gregory "forwards arguments about the applicability of the mature minor doctrine, the strength of [his] religious beliefs, and the evolving rights of bodily autonomy[,] [t]hese arguments do not go to the [Hospital Authority's] authority to seek an expedited *ex parte* transfusion order.... [His] enemy here was the order. [His] enemy was the judge." *Niebla,* 1992 WL 140250 at *4, 1992 U.S.App. LEXIS 15,049 at *12. To the extent any violation of Gregory's rights to bodily self-determination could have occurred, the order issued by Judge Hines is the *"proximate cause* of the injury." *Hoffman v. Halden,* 268 F.2d 280, 297 (9th Cir.1959), *overruled on other grounds, Cohen v. Norris,* 300 F.2d 24 (9th Cir.1962). "In the usual case, the order of the court would be the proximate cause and

the various preliminary steps would be remote causes of any injury...." *Id.* at 296–97. But if Judge Hines "was so deceived and hoodwinked by proceedings brought before him[,] ... certain of these preliminary acts might ... raise themselves to the status of a proximate cause of an injury, notwithstanding the intervening order of the court." *Id.* at 297. As noted previously, however, there is nothing in this record which tends to indicate that Mr. Bishop or any of the private defendants were participants in some elaborate scheme of deception. Thus, this Court finds that the legal cause of Gregory receiving a blood transfusion against his will was the court order issued earlier in the day on June 20, 1989. Accordingly, the legal cause of any constitutional violation visited upon Gregory due to the transfusion was that order and not the actions taken by the various defendants leading up to the order.

*B. Procedural Due Process.*

Plaintiffs have argued that Gregory Novak's procedural due process rights were violated because 1) under Georgia law he had a right to refuse unwanted medical treatment because he was a "mature minor" at the time; and 2) because he was not afforded an opportunity to be heard at an adversarial hearing prior to his restraint and forced blood transfusion. Defendants have argued that Georgia law recognizes no right of "mature minors" to either consent to or refuse medical treatment. Defendants argue further that Gregory Novak received more process than is required by the Constitution before being forced to receive a blood transfusion. Based on a review of the arguments made by the parties and applicable law, the Court finds that plaintiffs have failed to present a question of fact with respect to any procedural due process claims based on the blood transfusion itself.

*1. Do "Mature Minors" have the right to refuse unwanted medical treatment under Georgia Law?*

Plaintiffs have argued that the state of Georgia recognizes a mature minor's right to refuse medical treatment and that such right is protected from arbitrary denial by

federal procedural due process requirements. In so arguing, plaintiffs have cited a number of related sections in the Georgia Code which plaintiffs assert support their position. *See* O.C.G.A. §§ 39–1–1 et seq. (1991). Defendants cite to the very same provisions of the Georgia Code in support of their assertion that Georgia has established a scheme of "bright line" tests for deciding who has the power to consent to and refuse medical treatment. Upon a review of the applicable code provisions and cases construing them, the Court concludes that Georgia does not recognize the right of a "mature minor" to refuse unwanted medical care.

The general rule is that adults have the power to consent to or refuse medical care on behalf of themselves. O.C.G.A. § 31–9–2 (1991) (power to consent); O.C.G.A. § 31–9–7 (1991) (right to refuse). The age of majority in Georgia is eighteen and prior to reaching that age, "*all persons* are minors." O.C.G.A. § 39–1–1(a) (1982) (emphasis added). Plaintiffs point to various statutory exceptions to the general rules as support for their position. *See* O.C.G.A. § 31–9–2(a)(2), (3), & (5). These exceptions allow minors who are married, pregnant or have children the power to consent to medical treatment for themselves, their spouses and their children. Rather than supporting plaintiffs' position, however, these exceptions undermine it. If minors, "mature" or otherwise, possessed the power consent to and/or refuse medical treatment, there would be no need for these specific statutory exceptions. Moreover, with respect to the right to refuse medical treatment, the Georgia Code's protections are expressly limited to the "right of a person *18 years of age or over* to refuse to consent to medical and surgical treatment to his own person." O.C.G.A. § 31–9–7 (1991) (emphasis added); *see also, Jefferson v. Griffin Spalding County Hospital Authority,* 247 Ga. 86, 89, 274 S.E.2d 457 (1981) (power of state to force medical treatment on competent *adult* "exceedingly limited") (Hill, P.J., concurring); *Kirby v. Spivey,* 167 Ga.App. 751, 753, 307 S.E.2d 538 (1983) ("lucid *adult*" may refuse "recommended medical procedures").

Plaintiffs have argued that the "mature minor" exception is a part of the common law of Georgia and that any statute in derogation of that common law must be read narrowly. However, they have failed to direct this Court's attention to any reported Georgia case recognizing the exception. Thus, contrary to the position urged by plaintiffs, the Court finds that Georgia provides no "mature minor" exception to its general rule that only adults may refuse unwanted medical care.

*2. Federal procedural due process requirements.*

■ Plaintiffs argue that Gregory Novak was denied procedural due process because he did not receive notice and an opportunity to be heard at an adversarial hearing prior to being confined and forced to receive unwanted medical care. Defendants have urged that Gregory received more than the minimum due process required by the Fourteenth Amendment. After reviewing the case law and arguments of the parties, the Court finds that procedural due process did not require that Gregory Novak be accorded notice and an adversarial hearing. As his situation was reviewed by three doctors, a court appointed guardian *ad litem,* and an impartial judge, the Court finds that Gregory Novak was not deprived of procedural due process due to the lack of notice and a hearing prior to the blood transfusion.

The parties agree that Gregory was restrained and forced to receive a blood transfusion on June 20, 1989, pursuant to a court order issued earlier that day. Thus Gregory was "confined" so that he could receive medical care. "It is not disputed that a child, in common with adults, has a substantial liberty interest in not being confined unnecessarily for medical treatment and that the state's involvement in the commitment decision constitutes state action under the Fourteenth Amendment." *Parham,* 442 U.S. at 600, 99 S.Ct. at 2503. However, the same argument now advanced by plaintiffs was rejected in *Parham. Id.* at 607, 99 S.Ct. at 2506. As the Court finds *Parham* to be dispositive of the issues raised on this question, plaintiffs have failed to raise any issue of fact with respect to Gregory's claimed deprivation of procedural due process.

In *Parham,* the Supreme Court decided that the procedural safeguards provided for

in the commitment of juveniles to Georgia's state mental hospitals were constitutionally adequate. *Id.* Under the Georgia law at issue in *Parham,* a minor could be "voluntarily" committed to a state mental institution by his parents without any court intervention.[20] The only review of the commitment was that performed by the admitting physician. In holding that the review by the staff physician was adequate protection of the child's interest in not being confined unnecessarily for medical treatment, the Court reasoned that: "Due process has never been thought to require that the neutral and detached trier of fact be law trained or a judicial or administrative officer." *Id.* at 607, 99 S.Ct. at 2506–07.

Like J.R. in the *Parham* case, a surrogate standing in the shoes of Gregory Novak's parent consented for him to receive medical care which required confinement. Also, as in *Parham,* the state was "involved" in the decision to confine a child for medical treatment due to the Hospital Authority's involvement. In this case, however, Gregory's medical situation was reviewed by three physicians who were intimately aware of Gregory's overall condition and who all agreed he was in dire need of the medical treatment at issue. This medical conclusion was tested by Judge Hines and the court appointed guardian *ad litem.*

Plaintiffs' attempt to distinguish *Parham* because it is based on a situation in which a parent had initially requested the treatment to which the child objected, whereas, in Gregory's case, his parents agreed with his decision to decline treatment. Plaintiffs' argument is misplaced. The child in *Parham* was a ward of the state and it was the state acting in the place of his parent that had consented to the commitment. 442 U.S. at 617, 99 S.Ct. at 2511. The *Parham* Court reasoned that, while some additional process might be due with respect to the decision to commit the child for the long term because of the state's involvement, the statute provided adequate protection for the initial confinement. 442 U.S. at 619, 99 S.Ct. at 2512.

The total period of Gregory's "confinement" so that he could receive a blood transfusion was approximately seven hours. Prior to his confinement, his situation was reviewed by five independent "neutral factfinder[s]", *Parham,* 442 U.S. at 606, 99 S.Ct. at 2506, one of whom was an impartial judge. Moreover, Gregory's court appointed guardian *ad litem,* who was bound to protect the interests of his ward, concurred in the judgment and asked the court to order the transfusion. In doing so, he acted in the place of Gregory's mother and his actions were analogous to the parental consent in *Parham.* 442 U.S. at 619, 99 S.Ct. at 2512 (those acting *in loco parentis* have duty to consider best interest of the child); O.C.G.A. § 29–4–7 (1993) (guardian *ad litem* responsible to minor as if he were regularly qualified guardian). Based on the brief duration of his confinement and the extensive review of the Hospital Authority's efforts in seeking a court ordered blood transfusion, this Court finds that Gregory Novak was not deprived of his procedural due process rights due to the lack of notice and a hearing prior to the blood transfusion.

## VI. Liability of Private Defendants.

### A. Introduction.

Plaintiffs' Complaint alleges § 1983 claims against a number of private defendants who participated in varying degrees in Gregory Novak's medical care, the administration of Gregory's blood transfusion and in the hearings conducted on June 19 and 20, 1989. In order for § 1983 liability to attach to any given defendant, plaintiffs must show that the defendant violated their constitutional rights and that the defendant did so "under color of state law." *Bendiburg,* 909 F.2d at 468. Plaintiffs argue that Dr. Henderson, Dr. Tucker, Dr. Gray, Mr. Pedrick and Mr. Landers became state actors by conspiring with Judge Hines and Mr. Bishop to secure the *ex parte* guardianship and blood transfusion orders.

---

**20.** In *Parham,* the child was a ward of the state rather than his natural parents at the time of his commitment. The court found that no different procedures were required to protect the child's interest since the state agency *in loco parentis* had the duty to consider the best interest of the child in its determinations. Similarly, in this case Gregory's court appointed guardian *ad litem* was charged with the duty of protecting the child's best interests.

To prove a § 1983 conspiracy, a plaintiff "must show that the parties 'reached an understanding' to deny the plaintiff his or her rights ... [and] prove an actionable wrong to support the conspiracy." *N.A.A.C.P. v. Hunt,* 891 F.2d 1555, 1563 (11th Cir.1990) (citations omitted). "For purposes of 42 U.S.C. 1983, the plaintiff must plead in detail, through reference to material facts, the relationship or nature of the conspiracy between the state actor(s) and the private persons." *Harvey v. Harvey,* 949 F.2d 1127, 1133 (11th Cir.1992) (citing *Fullman v. Graddick,* 739 F.2d 553, 556–57 (11th Cir.1984)). Merely conclusory, vague and general allegations of conspiracy are not sufficient. *Fullman,* 739 F.2d at 556–57. "[C]ourts insist that plaintiffs state with specificity the facts supporting an allegation of conspiracy in order to control frivolous conspiracy suits under § 1983." *Schlosser v. Coleman,* 818 F.Supp. 1534, 1537 (M.D.Fla. 1993) (citing *Slotnick v. Staviskey,* 560 F.2d 31 (1st Cir.1977)). Based on the record in the case now before this Court, the Court finds that plaintiffs have failed to carry their burden with respect to the alleged conspiracies.

### B. Alleged Conspiracy with Samuel D. Bishop.

Plaintiffs state that "[d]iscovery has established beyond question that Kennestone Hospital and Samuel Bishop were intimately involved in arranging for and setting up the June 19th and June 20th hearings." (Pls.' Joint Mem. of Law in Opp'n to Defs.' Motions for Summ.J. at 21). Plaintiffs' assertion in this regard is correct, but without more, this does not establish a conspiracy. *Harvey,* 949 F.2d at 1133; *Schlosser,* 818 F.Supp. at 1537. The private defendants did participate in a "joint activity" with Mr. Bish-

op and the Hospital Authority in seeking access to the courts to appoint a guardian for Gregory Novak.[21] However, these private defendants who sought a court order to appoint a temporary guardian pursuant to state legal processes do not become state actors subject to § 1983 liability merely because they did so "with knowledge of and pursuant to" a Georgia statute. *Dahl v. Akin,* 630 F.2d 277, 281 (5th Cir.1980); *see also Harvey* 949 F.2d at 1133 (accord), *Cobb v. Georgia Power Co.,* 757 F.2d 1248, 1251–52 (11th Cir. 1985) (accord). Plaintiffs have done no more than establish that these parties took the necessary steps to secure medical treatment for a patient who, in the unanimous opinion of his treating physicians, was in dire need of such treatment and have pointed to no specific facts that "could prove [that] private and ... state actors had 'reached an understanding' to violate [the plaintiffs'] rights." *Harvey,* 949 F.2d at 1133. *See also Schlosser,* 818 F.Supp. at 1537.[22]

All the private defendants in this case have argued vigorously that regardless of any liability on the part of the state actor, Mr. Bishop, they are not subject to § 1983 liability because plaintiffs have failed to point this Court to any specific evidence upon which a jury could reasonably base a finding that the private defendants either acted in concert or conspired with the state actor and that such joint action deprived the plaintiffs of their constitutional rights. Plaintiffs have also argued vigorously that, based on the Eleventh Circuit's decision in *Bendiburg,* a question of fact is raised with regard to such joint activity. Plaintiffs' arguments are inapposite due to their inability to point to the types of evidence that prevented the Eleventh Circuit from granting summary judgment for the defendants in *Bendiburg.*

---

**21.** It is clear from the record that Dr. Gray took no part in the guardianship hearing on June 19, 1989 nor provided any of the impetus for that hearing. In fact, he was not even aware the hearing took place until the next day. Likewise, Dr. Gray took no part in the hearing on June 20, 1989, when the order allowing a blood transfusion was issued by Judge Hines. Plaintiffs have failed to establish any participation in these legal proceedings by Dr. Gray.

**22.** There is no evidence in the record indicating that Dr. Henderson knew what legal process was

required to enable him to treat his patient as he believed was necessary to the patient's survival. It appears that he was aware that some type of hearing was in order and he took action to get the matter before a court. There is, however, no indication in the record that he knew his characterization of Gregory's situation as an emergency might alter the legal process employed by the Hospital Authority's attorneys. The evidence unequivocally indicates that he merely rendered his considered medical opinion to persons who would then initiate some form of legal process.

Although plaintiffs are not required to produce "smoking gun" evidence of a conspiracy, *Bendiburg,* 909 F.2d at 469, the significant factual distinctions between this case and *Bendiburg* tend to undermine the Plaintiffs' position. In *Bendiburg,* there was evidence which tended to show that the private defendants had contemplated seeking a custody order as much as three weeks prior to the time the supposed "medical emergency" necessitated an *ex parte* custody hearing "as well as other evidence that could support a finding that the private defendants 'conspired' among themselves to overstate the immediacy of the medical emergency which caused plaintiff to be deprived of his parental rights." 707 F.Supp. at 1327–28. The Eleventh Circuit found that, to the extent the private defendants may have exaggerated the emergency nature of the child's condition in order to provide the state actor with a reason to seek custody on an *ex parte* basis when they finally acted, a question of fact was presented on the conspiracy issue. *Bendiburg,* 909 F.2d at 469. In the case currently before this Court, there simply is no evidence that any of the private defendants planned ahead to seek the appointment of a temporary guardian and then manufactured a medical emergency at the last minute in order to give the state actors a reason to act on an *ex parte* basis.

 Plaintiffs would have this Court find that a question of fact exists with respect to "conspiracy" anytime a doctor renders his medical opinion to a state actor who in turn seeks judicial relief on an *ex parte* basis because the doctor's assessment of the emergency might be incorrect or exaggerated. Plaintiffs effectively seek to bootstrap allegations of medical malpractice into a § 1983 claim by tacking on a conclusory "conspiracy" allegation. As plaintiffs have painted the picture, a bald allegation that the doctor

intentionally exaggerated the emergency nature of the situation to induce the state actor to seek *ex parte* relief would be enough to escape summary judgment on a § 1983 claim against a private doctor. Likewise, plaintiffs would have this court refuse summary judgment to the attorneys who represented the hospital in the *ex parte* hearing on the same reasoning because the attorney *might* be a part of the doctors' "conspiracy." This Court does not read the *Bendiburg* decision so broadly. Plaintiffs have provided no evidence, circumstantial or otherwise, to support the inference that the private defendants did anything other than try to resolve the situation created by Gregory Novak's medical needs in a lawful manner.[23]

### C. Alleged Conspiracy with Judge Hines.

 Plaintiffs also claim that all the private defendants became state actors by conspiring with Judge Hines to secure the guardianship and blood transfusion orders. (Pls.' Mem. of Law in Supp. of Joint Mot. for Summ.J. at 7) ("Defendants conspired or acted in concert with Judge Hines by willfully participating in joint action with him to deprive Gregory Novak of procedural due process and to produce the *ex parte* guardian *ad litem* appointment."). A state court judge is definitely a state actor. *Harvey,* 949 F.2d at 1133. If plaintiffs had identified evidence tending to show that the private defendants conspired with the judge to injure plaintiffs and such injury deprived them of their constitutional rights, the private defendants would have acted under color of state law, notwithstanding the fact the judge is immune from § 1983 civil liability. *Dennis v. Sparks,* 449 U.S. 24, 28, 101 S.Ct. 183, 186, 66 L.Ed.2d 185 (1980). However, plaintiffs have failed to identify any evidence to support the naked assertion that a conspiracy existed between Judge Hines and the private defen-

---

**23.** As with plaintiffs' arguments regarding the existence of a medical emergency on the afternoon of June 19, 1989, plaintiffs point to their medical expert testimony and the twenty hour delay in administering the blood transfusion for support of their conspiracy theory. The Court finds this evidence more relevant to determining the accuracy of the doctors' assessments than to the existence of a conspiracy among the medical personnel. Plaintiffs also cite words and phrases in Gregory's medical records from June 18–20,

1989, which, if read in isolation, could indicate that Gregory was not in emergent need of additional medical treatment. However, when read in context, these records clearly reflect all three doctors' opinions that Gregory could suffer severe consequences if blood was not administered in short order. There simply is no factual basis in the record to conclude that the doctors arrived at their respective opinions as part of a deception.

dants. Plaintiffs argue that the private defendants:

> provided the judge with false information, but no allegation [or evidence] says the judge was aware of the [alleged] falsity. Without the judge's *knowledge*, the complaint fails to properly allege conspiracy involving a state actor. At best, it presents a claim for misuse of state judicial procedures, for which there is no action under section 1983. *See Beker Phosphate Corp. v. Muirhead*, 581 F.2d 1187, 1189 (5th Cir.1978).

*Harvey*, 949 F.2d at 1133 (emphasis added). As with the alleged conspiracy between Mr. Bishop and the private defendants, plaintiffs have done no more than make purely conclusory allegations without directing this Court to any supporting evidence. Thus, the Court finds that plaintiffs have failed to present an issue of fact with regard to the alleged conspiracy between the private defendants and *any* state actor.

## VII. *Plaintiffs' State Law Claims.*

Because all the claims over which the Court had original jurisdiction now have been removed from the case due to the Court's decision to grant all defendants' motions for summary judgment with respect to the federal claims, § 1367(c)(3) applies.[24] As the Supreme Court has observed, "a federal court should consider and weigh in each case, and at every stage of the litigation, the values of judicial economy, convenience, fairness, and comity in order to decide whether to exercise jurisdiction over a case brought in that court involving pendent state-law claims. When the balance of these factors indicates that a case properly belongs in state court, as when the federal-law claims have dropped out of the lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction by

dismissing the case without prejudice." *Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350, 108 S.Ct. 614, 619, 98 L.Ed.2d 720 (1988) (footnote omitted). *See also Hardy v. Birmingham Bd. of Educ.*, 954 F.2d 1546, 1550 (11th Cir.1992).

The Court concludes that dismissal is appropriate in this case, both because all federal claims have been dismissed and because the remaining case raises a wide variety of complex state law issues. "Needless decisions of state law should be avoided both as a matter of comity and to promote justice between the parties, by procuring for them a surer-footed reading of applicable law. Certainly, if the federal claims are dismissed *before trial*, even though not insubstantial in a jurisdictional sense, the state claims should be dismissed as well." *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966) (emphasis added) (footnote omitted). Accordingly, the Court dismisses the remaining state law claims without prejudice.

### CONCLUSION

For the foregoing reasons, defendants W. Grady Pedrick's and Jerry A. Landers' Motion for Summary Judgment [114–1] is **GRANTED,** defendant Richard G. Gray's Motion for Summary Judgment [115–1] is **GRANTED,** defendants Bradley E. Henderson's and John David Tucker's Motion for Summary Judgment [116–1] is **GRANTED,** and defendants Cobb County-Kennestone Hospital Authority's and Samuel D. Bishop's Motion for Summary Judgment [117–1] is **GRANTED.**

SO ORDERED.

---

24. This section provides that "[t]he district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3).