**Beth A. SHERK, Plaintiff**

v.

**ADESA ATLANTA, LLC, a Georgia Corporation, Defendant.**

**No. CIV. 3:04–CV–051–JTC.**

United States District Court, N.D. Georgia, Newnan Division.

Jan. 31, 2006.

Kenneth A. Weber, Baker, Donelson, Bearman, Caldwell & Berkowitz, P.C., Nashville, TN, Clint Crosby, Baker, Donelson, Bearman, Caldwell & Berkowitz, P.C., Atlanta, GA, Counsel for the defendant, ADESA Atlanta, LLC.

W. Edwin Litton, Atlanta, GA, Counsel for the plaintiff, Beth Sherk.

### ORDER

CAMP, District Judge.

This matter is currently before the Court on Defendant's motion for summary

judgment [# 39] and the Magistrate's Report and Recommendation [# 52] thereon. Plaintiff brings this action with three claims under Title VII of the Civil Rights Act of 1964 and one claim under the law of Georgia. The Magistrate recommends granting Defendant's motion as to Plaintiff's Title VII claims and dismissing without prejudice Plaintiff's state law claim.

Neither party has filed objections to the Magistrate's Report and Recommendation. Therefore, pursuant to 28 U.S.C. § 636(b)(1) and Federal Rule of Civil Procedure 72, the Court has reviewed it for clear error.

The Court finds no clear error. Accordingly, the Court **ADOPTS** the Magistrate's Report and Recommendation [# 52] as the opinion of the Court. Defendant's motion for summary judgment [# 39] as to Plaintiff's Title VII claims (counts I–III of the Complaint) is **GRANTED**. Defendant's motion for summary judgment [# 39] as to Plaintiff's defamation claim (count IV) is **DENIED**. In recognition that the claims over which the Court has original jurisdiction have been eliminated from this case, the Court declines to exercise supplemental jurisdiction over the remaining state law defamation claim. Accordingly, said claim is **DISMISSED without prejudice**.

### MAGISTRATE JUDGE'S FINAL REPORT AND RECOMMENDATION

WALKER, United States Magistrate Judge.

This case is presently before the Court on Defendant Adesa Atlanta's Motion for Summary Judgment. Docket Entry [39]. Plaintiff filed a response in opposition to Defendant's motion. Docket Entry [48]. Thereafter, Defendant submitted a reply brief in further support of its motion for summary judgment. Docket Entry [50]. For the reasons set forth more fully below, the undersigned **RECOMMENDS** that

Defendant's Motion for Summary Judgment be **GRANTED** as to Counts I, II, and III of Plaintiff's Complaint. In addition, because the undersigned recommends granting summary judgment for the Defendant on all claims over which the District Court has original jurisdiction, the undersigned **RECOMMENDS** that the Court **DECLINE** to exercise **SUPPLEMENTAL JURISDICTION** over Plaintiff's state law claim for defamation in Count IV of her Complaint.

### DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Plaintiff filed the instant lawsuit on April 29, 2004, alleging that Defendant Adesa Atlanta, LLC ("Adesa Atlanta") subjected her to a sexual harassment based hostile work environment and retaliated against her for engaging in protected activity, in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"). (Compl., Docket Entry [1], ¶¶ 10, 11, 28, 37). In addition, Plaintiff asserts a state law claim against Defendant for defamation based on Mr. Rush's statements to Adesa employees about Plaintiff and the reasons for her termination. (Compl. ¶ 45).

Defendant filed the instant Motion for Summary Judgment contending that (1) Plaintiff cannot establish a prima facie case of sexual harassment based hostile work environment under Title VII because favoritism toward a workplace paramour is gender neutral and does not alter the terms or conditions of the plaintiff's employment, and because the instant conduct is not sufficiently severe or pervasive; (2) Plaintiff cannot establish a prima facie case under Title VII for retaliation because Plaintiff cannot show that she held an objectively reasonable belief that she had opposed unlawful conduct by her employer; and (3) Plaintiff's state law defa-

mation claim fails as a matter of law because she cannot prove either the making or the publication of the alleged defamatory statements. (Defendant's Motion for Summary Judgment, [hereinafter "DMSJ"], Docket Entry 39, at 11, 15, 16, 18, 20).

In responding in opposition to Defendant's motion for summary judgment on Plaintiff's two retaliation claims, Plaintiff contends that she can show that she had a subjectively sincere and objectively reasonable belief that unlawful conduct had occurred and that she has direct evidence of retaliatory intent. (Pl. Resp. at 17–18, 19). Plaintiff also argues with respect to her retaliation claims that she based her belief that Defendant had engaged in unlawful conduct on the different treatment she received from male managers, rather than on the favoritism shown to the paramour of her supervisor. (Pl. Resp. at 21). Plaintiff does not respond directly to any of Defendant's arguments on either her sexual harassment based hostile work environment claim or her defamation claim; however, within the discussion of her retaliation claim, Plaintiff admits that "she cannot meet the heavy burden necessary to prove her claim of sexual harassment/hostile work environment." (Pl. Resp. at 17).

In Defendant's Reply, Defendant argues that Plaintiff's admission that she cannot prove her sexual harassment based hostile work environment claim and her failure to respond to any of its arguments on that claim and her defamation claim entitles Defendant to summary judgment. (Def.

Reply at 1–2). Defendant further argues with respect to Plaintiff's two retaliation claims that Plaintiff did not have an objectively reasonable belief that her employer's conduct violated the law. In support of its contention, Defendant distinguishes *Lipphardt v. Durango Steakhouse of Brandon, Inc.*, 267 F.3d 1183 (11th Cir.2001), the principle case upon which Plaintiff relies in her response, and asserts that Plaintiff has not presented any evidence showing Adesa Atlanta treated male managers disparately from female managers or that a male manager in Plaintiff's position would not have been treated as she was treated. (Def. Reply at 3–5).

## I. *STATEMENT OF FACTS* [1]

■ Plaintiff, a female, first began working for Adesa Corporation in February, 2001 at the Adesa Tampa facility in Tampa, Florida. (Pl. Dep. at 8;Sherk Dep. at 18). Adesa Corporation operates numerous wholesale auctions across the country at which banks and car dealers buy and sell used cars to other dealers. (Sherk Dep. at 8). Those auction facilities operated by Adesa Corporation include both Adesa Tampa and Defendant Adesa Atlanta. While the organizational structure varies between facilities, typically, a general manager heads each facility, and, depending on the general manager's needs, an assistant general manager assists him. (Sherk Dep. at 10). Each facility then employs several other managers and regular employees, such as sales em-

---

1. All facts taken directly from Defendant's Statement of Undisputed Facts have either been admitted or remain undisputed by Plaintiff. This Court must accept as admitted those facts in the moving party's statement that have not been "specifically controverted" with citation to the relevant portions of the record by the opposing party. Local Rule 56.1B(2), (3), N.D. Ga. Consequently, subjective perceptions, conclusory allegations, or al-

legations that are otherwise unsupported by record evidence do not create genuine issues of material fact in order to withstand summary judgment. *See Chapman v. AI Transp.*, 229 F.3d 1012, 1051 n. 34 (11th Cir.2000) (en banc); *Wood v. City of Lakeland*, 203 F.3d 1288, 1292 (11th Cir.2000); *Holifield v. Reno*, 115 F.3d 1555, 1564 n. 6 (11th Cir.1997); *Carter v. City of Miami*, 870 F.2d 578, 585 (11th Cir.1989).

ployees, sales representatives, and account managers. (Sherk Dep. at 10).

When Plaintiff first began working at the auction facility at Adesa Tampa, Adesa Corporate divided the country into eight regions with a regional vice president overseeing each region. (Sherk Dep. at 43; Price Dep. at 15). At that time, Mr. Howard Price was the regional vice president for the region of the state of Florida and Mr. David Bynum was the regional vice president for the south-eastern region encompassing the state of Georgia. (Sherk Dep. at 52; Price Dep. at 8). The general manager of each facility reports to the regional vice president, who functions as the corporate link between individual facilities and their management teams and the Adesa corporate office in Indianapolis. (Price Dep. at 9).

Adesa Tampa originally hired Plaintiff as a sales employee, but Mr. Tim Sherk, who was the assistant general manager of Adesa Tampa at that time, promoted Plaintiff to consignment sales and marketing manager around July, 2002 based on her performance.[2] (Compl. ¶ 1; Pl. Dep. at 9; Sherk Dep. at 19, 20). In this management position, Plaintiff's responsibilities expanded from soliciting dealers to do business at the Adesa Tampa auction facility to include retaining a franchise dealer base and increasing the rate and volume of consignment cars. (Pl. Dep. at 9). While at Adesa Tampa as the consignment sales and marketing manager, numerous senior management officials throughout the Adesa family thought Plaintiff performed very well. (Pl. Dep. at 12; Sherk Dep. at 18; Price Dep. at 18).

Around April, 2003, Plaintiff began working as the consignment sales manager for Adesa Atlanta, which had been experi-

encing low consignment rates. (Defendant's Statement of Undisputed Material Fact [hereinafter "DSUF"] ¶ 1; Pl. Dep. at 12–13, 37; Sherk Dep. at 25–26). Shortly thereafter, Ms. Lisa Cody was transferred to Plaintiff's department as a consignment sales representative. (Pl. Dep. at 33; Rush Dep. at 12, 20). Plaintiff had learned through office rumor that Mr. David Rush, the general manager of Adesa Atlanta and therefore Plaintiff's direct supervisor, was involved in a sexual relationship with Ms. Cody. (Pl. Dep. at 34, 35). Adesa Corporation prohibited such sexual relationships between supervisors and subordinate employees and explicitly outlined that prohibition in its Ethics Handbook. (Bynum Dep. at 18; Exh. 2). The Ethics Handbook reads in relevant part:

> Employees in supervisory positions are strictly prohibited from engaging in consensual romantic or sexual relationships with any employee reporting directly or indirectly to them. [Adesa] established this policy to avoid the following situations: violation of sexual harassment law; sexual harassment complaints; uncomfortable working conditions; morale problems among other employees; the appearance of impropriety; and interference of or other distractions from the Company's business interests.

(Bynum Dep. at 18, Exh. 2).

Adesa Corporation had previously disciplined Mr. Rush in February 2003, for his relationship with Ms. Cody after another employee complained to Mr. Bynum, the regional vice president for the region encompassing Georgia and accordingly Mr. Rush's direct supervisor, about Mr. Rush and Ms. Cody's relationship. (Rush Dep. at 16–18, Exh. 1; Bynum Dep. at 12, 17–18). Although a sexual relationship with a

---

**2.** Plaintiff married Tim Sherk around March 28, 1998 and subsequently divorced him in 2000. (Pl. Dep. at 10; Sherk Dep. at 17). Although Plaintiff was not married to Mr.

Sherk when she first began working at Adesa Tampa, Plaintiff's prior relationship with Mr. Sherk was fully disclosed. (Pl. Dep. at 10–11).

subordinate employee constituted grounds for immediate termination, Adesa Corporation only suspended Mr. Rush for one week and instructed him to terminate the relationship. (Bynum Dep. at 39; Rush Dep. at 16–18, Exh. 1). Adesa Corporation warned that if in the future it had a "reasonable suspicion" that Mr. Rush had continued his relationship with Ms. Cody, the company would terminate him. (Bynum Dep. at 39; Rush Dep. at 19, Exh. 1).

Nevertheless, Mr. Rush and Ms. Cody's relationship continued. (Pl. Dep. at 50). Plaintiff states that Ms. Cody spent a lot of time in Mr. Rush's office with the door closed, was in Mr. Rush's car with him all the time, and regularly arrived at events with him. (Pl. Dep. at 50). However, Plaintiff never saw Mr. Rush and Ms. Cody actually engage in any sort of romantic interaction, such as kissing. (DSUF ¶ 10; Pl. Dep. at 56–57). According to Mr. Rush and Ms. Cody, they attempted to conceal their relationship from their co-workers. (Rush Dep. at 26; Cody Dep. at 49–50).

Initially Ms. Cody performed well in the consignment sales department. (Pl. Dep. at 129). However, not long after May 2003, Ms. Cody's performance and her work attendance began to decline, reaching their low point around September or October 2003, after Plaintiff returned from her mother's funeral. (Pl. Dep. at 126–27). When Plaintiff's mother died on September 17, 2003, Plaintiff left town for about one week. (Pl. Dep. at 38–39). Plaintiff had recommended to Mr. Rush that Ms. Kelly Reilly, the marketing manager at Adesa Atlanta, oversee the consignment sales department while Plaintiff was out of town. (Pl. Dep. at 40). Plaintiff worried that leaving one member of the department in charge of the other members, who were all usually equals, would create conflict. (Pl. Dep. at 38). However, Mr. Rush appointed Ms. Cody, a member of the consignment sales department, as interim consignment sales manager instead, because he believed she had the most consignment sales experience. (Pl. Dep. at 39; Rush Dep. at 91). When Plaintiff returned from her mother's funeral, Ms. Cody wanted Plaintiff to terminate three of the consignment sales representatives, whom she stated had been insubordinate to her. (Pl. Dep. at 49–51). Plaintiff refused and stated in her deposition that this created tension between Ms. Cody and herself. (Pl. Dep. at 51).

It was at this point that Plaintiff alleges that the working environment became most hostile. Ms. Cody began acting in an insubordinate manner towards Plaintiff. (Pl. Dep. at 130–31). After Ms. Cody behaved insubordinately during an interaction with a customer, Plaintiff spoke with the assistant general manager of Adesa Atlanta, Ms. Tonya Abernathy, about Ms. Cody's behavior and the sexually hostile work environment. (Pl. Dep. at 61–62). Ms. Abernathy suggested issuing Ms. Cody a written reprimand and speaking to Mr. Rush about her concerns. (Pl. Dep. at 63). About one week after Plaintiff returned to Atlanta, Ms. Cody was transferred out of the consignment sales department. (Pl. Dep. at 47).

A day or two after Ms. Cody was transferred out of Plaintiff's department, Mr. Bynum invited Plaintiff to lunch because he believed Plaintiff was experiencing difficulty with the transition from Tampa to Atlanta. (Pl. Dep. at 53; Bynum Dep. at 30–31). Plaintiff explained to Mr. Bynum that the sexual relationship between Mr. Rush and Ms. Cody had created a hostile work environment.[3] (Pl. Dep. at 57–60;

---

**3.** Mr. Bynum denies that Plaintiff complained to him about either harassment or a hostile work environment arising out of Mr. Rush's relationship with Ms. Cody. (Bynum Dep. at 30, 37). However, on a motion for summary judgment, the Court must view the facts in the

Bynum Dep. at 30–31). Mr. Bynum said that he would be surprised if any relationship had continued because Adesa Corporation had previously disciplined Mr. Rush for this relationship and because Mr. Rush faced termination should such a relationship exist. (Bynum Dep. at 53–54).

About one week later, Mr. Rush presented Plaintiff with a written reprimand, dated October 22, 2003, at a meeting that also included Mr. Bynum. (Pl. Dep. at 68, Exh. 6; Rush Dep. at 72, Exh. 12). It was the first time Plaintiff had been disciplined by a supervisor during her employment with Adesa. (Pl. Dep. at 69). Specifically, Mr. Bynum and Mr. Rush stated that they believed Plaintiff's performance had not met their expectations and that the consignment sales department, itself, had not met its goals. (Pl. Dep. at 69; Bynum Dep. at 46–47, 49, 53, 58; Rush Dep. at 48). During Mr. Rush's deposition, he later admitted that during the previous month, September 2003, the consignment sales department at Adesa Atlanta had sold more cars than the department had sold during September, 2002; however, during each month prior to September in 2003, it had sold far fewer than the previous year. (Pl. Dep. at 61; Rush Dep. at 95–97, Exh. 13). Additionally, Mr. Bynum stated that Plaintiff had not implemented directives he had given her department during a meeting on October 15, 2003. (Bynum Dep. at 55). The reprimand stated that Mr. Rush "expect[ed] to see immediate and marked improvement within the next thirty days." (Pl. Dep. at 74; Bynum Dep. at 54–55, Exh. 4). Plaintiff did not complain about harassment or a hostile work environment at that meeting. (Bynum Dep. at 73).

That afternoon, Mr. Rush e-mailed Plaintiff and Ms. Reilly about the ticket and seating arrangements for an upcoming NASCAR race event Adesa Atlanta was hosting on October 26, 2003, to entertain clients, corporate personnel, and employees. (Rush Dep. at 30, 84, 85, Exh. 2; Pl. Dep. at 79, Exh. 10). The race was one of several functions Adesa Atlanta had planned for the week preceding the grand opening of its new auction facility on October 27, 2003. (Rush Dep. at 28; Bynum Dep. at 79). The company had purchased tickets to the race for both a suite and the grandstands, but because it had only a limited number of the expensive suite tickets, it earmarked those for particular clients and personnel. (Rush Dep. at 28–29). Mr. Rush therefore wrote Plaintiff and Ms. Reilly that "since [the] consignment contingency of dealers [would] be in the stands [Plaintiff] should be there as well." (Rush Dep. at 30, 84, 85, Exh. 2, David Rush E-mail, Oct. 22, 2003). Despite all the planning, Adesa Atlanta had to buy more tickets the day before the race because there were not enough for all of its guests. (Zumbaugh Dep. at 24). Mr. Rush, who did not attend the race, states that the company still did not have enough tickets for the suite the morning of the race, so he had to move people he had originally planned to seat in the suite to the grandstands or ask them not attend at all. (Rush Dep. at 29).

However, when people arrived at the race, there were extra seats available in the suite. (Pl. Dep. at 82). Plaintiff states that Ms. Zumbaugh, and possibly Mr. Bynum, asked her to help entertain clients in the suite. (Pl. Dep. at 80, 83). Because Plaintiff did not understand Mr. Rush's October 22, 2003 e-mail to mean that he did not want her in the suite during the race, Plaintiff and her father sat in the suite until the event was rained out. (Pl. Dep. at 80–8; Bynum Dep. at 62–67; Zum-

light most favorable to the non-moving party. See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250–52, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

baugh Dep. at 28–29, 33–34). Mr. Bynum and Ms. Zumbaugh also sat in the suite. (Bynum Dep. at 62, 64). Ms. Zumbaugh states that she was shocked by Plaintiff's presence in the suite with her father when there had been a shortage of suite tickets. (Zumbaugh Dep. at 33–34). Similarly, Mr. Bynum states that he does not know of anyone having invited Plaintiff into the suite. (Bynum Dep. at 62). However, no one said anything to Plaintiff about her presence with her father in the suite at that time. (Zumbaugh Dep. at 33–34; Bynum Dep. at 62).

About ten to fourteen days after Plaintiff complained to Mr. Bynum about Mr. Rush and Ms. Cody's relationship and the resulting sexual harassment based hostile work environment, Mr. Rush began avoiding Plaintiff and stopped speaking to her. (Pl. Dep. at 44, 130–31). Mr. Rush would not answer telephone calls from Plaintiff or return her voice-mail messages and e-mails. (Pl. Dep. at 44). Indeed, Mr. Rush only spoke to Plaintiff in group settings. (Pl. Dep. at 44–45). However, Mr. Rush never said anything Plaintiff found sexually offensive, touched Plaintiff in an offensive manner, made any sexual advances toward Plaintiff, nor used vulgar language when addressing her. (DSUF ¶¶ 6–9; Pl. Dep. at 42–43). In Plaintiff's deposition, she states that she believes Mr. Rush made things difficult for her at Adesa Atlanta because of Plaintiff's conflict with Lisa Cody. (Pl. Dep. at 45).

On the morning of October 29, 2003, Plaintiff spoke with the human resource manager at Adesa Atlanta, Ms. Brenda Stevenson, about Mr. Rush's sexual relationship with Ms. Cody and the resultant sexual harassment and hostile work environment. (Pl. Dep. at 63–65). That afternoon, in a meeting that included Mr. Bynum, Mr. Rush terminated Plaintiff's employment for poor sales performance and insubordination. (Pl. Dep. at 64;

Rush Dep. at 28, Exh. 10). The written separation notice given to Plaintiff merely references Plaintiff's "unacceptable job performance in the achievement of sales goals and related department responsibilities, [and] failure to follow directives." (Rush Dep. at 28, Exh. 10). However, in his deposition, Mr. Rush cites the insubordination shown by Plaintiff by sitting in the suite at the NASCAR race with her father as the main reason for his decision to terminate Plaintiff. (Rush Dep. at 28). Indeed, the Adesa employee handbook lists insubordination as grounds for immediate termination. (Pl. Dep. at 77–79, Exh. 9).

A few hours thereafter, Plaintiff phoned the corporate ethics hotline. (Pl. Dep. at 96). Plaintiff states that she complained about the sexual harassment and hostile work environment she believed Mr. Rush and Ms. Cody's relationship had exposed her to. (Pl. Dep. at 96–97, Exh. 16). However, the receptionist documenting the call only recorded that Mr. Rush had terminated Plaintiff for low productivity. (Pl. Dep. at 96, Exh. 16). In Mr. Rush's deposition, he states that he did not learn of Plaintiff's ethics hotline complaint against him until sometime after April 19, 2004. (Rush Dep. at 52–53).

On October 31, 2003, Plaintiff sent Mr. Rush an e-mail, that she had written prior to her termination, in response to the October 22, 2003 written reprimand she received. (Pl. Dep. at 73, Exh. 7). In the e-mail, Plaintiff denied the allegations that she had failed to implement Mr. Bynum's October 15, 2003 directives and that she had left work early on October 16, 2003, for her 35th birthday. (Pl. Dep. at 70–72, 73, Exh. 7). Plaintiff also wrote in the final paragraph of the e-mail, "please just note how truly sorry I am for the way things ended. I think that you had several issues with me regarding different circum-

stances that you did not bring to my attention." (Pl. Dep. at 73, Exh. 7). Plaintiff explained in her deposition that the several issues referred to her relationship with Lisa Cody. (Pl. Dep. at 75).

Shortly after her termination, Plaintiff spoke with Mr. Sherk, who had become general manager of Adesa Tampa, about her termination. (Sherk Dep. at 37–38). Explaining that she believed she had been terminated because of her relationship with Mr. Rush, Plaintiff stated to Mr. Sherk that "there was something between her and [Ms. Cody] and David [Rush] took it out on her." (Sherk Dep. at 38). Plaintiff also spoke with Mr. Sherk and Mr. Price about working at Adesa Clearwater. (Price Dep. at 29, 37; Sherk Dep. at 37–38, 52). While Mr. Sherk never made Plaintiff a job offer, he "made it clear that if we could rehire her, then we'd rehire her." (Sherk Dep. at 53). Similarly, Mr. Price spoke with Plaintiff on numerous occasions about hiring her to work at Adesa Clearwater and even spoke to her in general terms about salary. (Price Dep. at 36).

Although neither Mr. Sherk nor Mr. Price viewed Plaintiff's ethics hotline phone call as a problem, Mr. Price asked Plaintiff if she would recant her ethics hotline complaint. (Price Dep. at 41; Sherk Dep. at 54–56). After Plaintiff agreed, Mr. Price sent an e-mail, dated November 10, 2003, with the subject "Beth Sherk," to Mr. Don Harris, the Chief Operating Officer of Adesa, stating that "she will write a retraction to the hotline call as it was made in the heat of the moment with personal feelings rather than business judgment." (Price Dep. at 39, Exh. 1). When Mr. Sherk asked Mr. Bynum about rehiring Plaintiff, Mr. Bynum told Mr.

Sherk he could not rehire Plaintiff. (Sherk Dep. at 43). Mr. Price also later told Mr. Sherk he could not rehire Plaintiff because Mr. Harris had a problem with the ethics hotline phone call.[4] (Sherk Dep. at 54). Ultimately, Adesa did not rehire Plaintiff for its Clearwater facility or any other facility.

Plaintiff filed a charge with the Equal Employment Opportunity Commission ("EEOC"), alleging sexual harassment, hostile work environment, and retaliation and received her right to sue notice on January 30, 2004. (Compl.¶5). This lawsuit followed.

## II. CONCLUSIONS OF LAW

### A. Summary Judgment Standard

A motion for summary judgment shall be granted "if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). At the summary judgment stage, the court must examine all evidence in the light most favorable to the non-moving party and resolve all reasonable doubts in his favor. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Pipkins v. City of Temple Terrace,* 267 F.3d 1197, 1199 (11th Cir.2001).

On a motion for summary judgment, "the moving party bears the initial burden to show, by reference to materials on file, that there are no genuine issues of material fact to be determined at trial." *Mullins v. Crowell,* 228 F.3d 1305, 1313 (11th Cir.2000) (citing *Clark v. Coats & Clark,*

---

4. Mr. Price denies in his deposition that he ever said that Mr. Harris told him Plaintiff could not be rehired because of her ethics hotline complaint. Mr. Price admits informing Mr. Sherk that Plaintiff could not be re-

hired at Adesa Clearwater; however, Mr. Price testifies that he does not know who actually made that decision or the reasons for it. (Price Dep. at 37–38, 42).

*Inc.*, 929 F.2d 604, 608 (11th Cir.1991)). Once the movant has shown the non-existence of any genuine issue of material fact, it is up to the Plaintiff to produce some evidence in support of his claim. *Anderson*, 477 U.S. at 252, 106 S.Ct. 2505. Mere conclusory allegations of discrimination or harassment are not enough to withstand a motion for summary judgment. *Carter v. City of Miami*, 870 F.2d 578, 585 (11th Cir.1989). In other words, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson*, 477 U.S. at 247–48, 106 S.Ct. 2505. An issue is not genuine if it is unsupported by evidence or if it is created by evidence that is "merely colorable" or "not significantly probative." *Id.* at 250, 106 S.Ct. 2505. Likewise, a fact is only material if it is so designated by controlling substantive law as an essential element of Plaintiff's case. *Id.* at 248, 106 S.Ct. 2505.

If neither party can prove the existence or nonexistence of an essential element of a claim, summary judgment will be granted if the movant shows that the Plaintiff will be unable to meet her burden of proof at trial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The movant's burden therefore requires a " 'showing'—that is, pointing out to the district court that there is an absence of evidence to support the nonmoving party's case." *Id.* The nonmovant's failure to offer proof of an essential element to her case renders all facts immaterial, thus entitling the movant to judgment as a matter of law. *Id.* at 323, 106 S.Ct. 2548.

## B. *Plaintiff's Title VII Retaliation Claims*

Plaintiff alleges that Defendant retaliated against her after she complained to Mr.

Bynum about the sexual harassment and hostile work environment created by Mr. Rush and again after she made a similar complaint over the ethics hotline. (Compl. ¶ ¶ 28,36–38; Pl. Resp., at 16). Defendant contends in its motion for summary judgment that Plaintiff's Title VII retaliation claims fail as a matter of law because Plaintiff cannot show that she held an objectively reasonable belief that her employer had engaged in unlawful conduct. (DMSJ at 18).

Plaintiff argues that she can show that she had a subjectively sincere and objectively reasonable belief that unlawful conduct had occurred because (1) she complained to numerous managers at Adesa about Mr. Rush's relationship with Ms. Cody; (2) Adesa's ethics handbook makes the causal connection between consensual romantic relationships between supervisory personnel and inferior employees and sexual harassment; (3) Defendant quickly disciplined Plaintiff each time she complained of Mr. Rush and Ms. Cody's relationship based on specious reasons; and (4) Mr. Rush did not stop speaking to any of the male managers at Adesa. (Pl. Resp. at 17–18, 19). With respect to Plaintiff's second retaliation claim, Plaintiff also contends that Mr. Price's statement that Mr. Harris would not approve the rehiring of Plaintiff because she had filed a complaint with the ethics hotline constitutes direct evidence of retaliation. (Pl. Resp. at 19). Finally, Plaintiff argues that neither of her retaliation claims are founded on the belief that Mr. Rush treated Ms. Cody more favorably than Plaintiff. (Pl. Resp. at 21). In Defendant's reply, Defendant reiterates that Plaintiff did not have an objectively reasonable belief that her employer's conduct violated the law. Defendant distinguishes *Lipphardt v. Durango Steakhouse of Brandon, Inc.*, 267 F.3d 1183 (11th Cir. 2001), the principle case upon which Plaintiff relies in her response, by arguing that

unlike the instant case, the sexual harassment hostile work environment claim in *Lipphardt* presented a close issue, thereby making the question of whether the plaintiff in that case had an objectively reasonable belief for her retaliation claim similarly close. (Def. Reply at 3).

■ Title VII makes it unlawful for an employer to discriminate against an employee "because [s]he has opposed any practice made an unlawful employment practice by this subchapter, or because [s]he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter." 42 U.S.C. § 2000e–3(a). To make out a prima facie case of retaliation under Title VII, the plaintiff must show that (1) she engaged in protected opposition to Title VII discrimination or participated in a Title VII proceeding; (2) she suffered an adverse employment action by the employer simultaneously with or subsequent to such opposition or participation; and (3) a causal connection exists between the protected activity and the adverse employment action. *Gupta v. Florida Bd. of Regents,* 212 F.3d 571, 587 (11th Cir.2000); *Hudson v. Norfolk Southern Ry. Co.,* 209 F.Supp.2d 1301, 1307 (N.D.Ga.2001) (citing *Morgan v. City of Jasper,* 959 F.2d 1542, 1547 (11th Cir.1992)). Once the plaintiff makes a prima facie showing, the burden shifts to the defendant to present evidence that it had a legitimate, nondiscriminatory reason for terminating the plaintiff. If the defendant proffers such a reason, the burden of going forward returns to the plaintiff, who must show that the defendant's proffered reason was a pretext for discrimination. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802–04, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Texas Dep't of Cmty. Affairs v. Burdine,* 450 U.S. 248, 254, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Chapman v. AI Transp.,* 229 F.3d 1012, 1024 (11th Cir.2000) (en banc).

■ The Eleventh Circuit recognizes "two forms of statutorily protected conduct" under Title VII. *See Clover v. Total Sys. Servs., Inc.,* 176 F.3d 1346, 1350 (11th Cir.1999). Title VII protects an employee from retaliation if (1) "he has opposed any practice made an unlawful employment practice by this subchapter" (the opposition clause) or (2) "he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter" (the participation clause). *See Hudson,* 209 F.Supp.2d at 1308; 42 U.S.C. § 2000e-(3)(a). "A plaintiff engages in 'statutorily protected activity' when he or she protests an employer's conduct which is actually lawful, so long as he or she demonstrates 'a good faith, reasonable belief that the employer was engaged in unlawful employment practices." *Harper v. Blockbuster Entertainment Corp.,* 139 F.3d 1385, 1388 (11th Cir.1998) (citing *Little v. United Technologies Carrier Transicold Division,* 103 F.3d 956, 960 (11th Cir.1997)); *see also Rollins v. State of Fla. Dept. of Law Enforcement,* 868 F.2d 397, 400 (11th Cir. 1989). The plaintiff must demonstrate that she subjectively believed her employer was engaged in unlawful employment practices and that this subjective belief was objectively reasonable in light of the facts and record presented. *Harper,* 139 F.3d at 1388 (holding that plaintiffs' belief that employer's policy of requiring male employees to wear their hair shorter than female employees violated Title VII was not objectively reasonable because every circuit to address such a policy had found that it was not gender discrimination, no recent case identified by plaintiffs had supplanted the conclusions of binding precedent, and the EEOC Compliance Manual stated that successful litigation of the issue would be virtually impossible); *Little,* 103 F.3d at 960 (holding that plaintiff's belief that his employer violated the law when a

co-worker made a racially derogatory comment was not objectively reasonable because plaintiff never voiced his concern over his co-worker to a supervisor and first reported the comment eight months after he heard it at a team meeting). The court measures the objective reasonableness of an employee's belief against existing substantive law and, accordingly, charges the plaintiff with substantive knowledge of the law. *Clover v. Total System Services, Inc.*, 176 F.3d 1346, 1351 (11th Cir.1999); *Harper*, 139 F.3d at 1388 n. 2. (noting that failure to charge a plaintiff with substantive knowledge of the law would transform the reasonableness inquiry into mere speculation as to their subjective knowledge).

■ In the instant case, Plaintiff alleges that her opposition to Defendant's sexual harassment based hostile work environment by complaining to Mr. Bynum and by filing a complaint with the corporate ethics hotline led to Defendant's retaliatory conduct. Therefore, the Court must assess whether Plaintiff reasonably believed Defendant had created a sexual harassment based hostile work environment. To establish a *prima facie* case of a hostile work environment based on sexual harassment, a plaintiff must show that (1) the plaintiff belongs to a protected group; (2) the plaintiff was subjected to unwelcome harassment; (3) the harassment was based on the plaintiff's sex; (4) the harassment was objectively and subjectively severe or pervasive so as to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) a basis exists for holding the employer liable.[5] *Walton*, 347 F.3d at 1279–1280; *Miller v. Kenworth of Dothan, Inc.*, 277 F.3d 1269, 1275 (11th Cir.2002).

■ Applying the law to the facts of this case, the undersigned finds that Plaintiff did not have a reasonable belief that her employer had violated the law. First, the unanimity with which the courts have declared favoritism of a paramour to be gender-neutral belies the reasonableness of Plaintiff's belief that such favoritism created a hostile work environment. *See Harper*, 139 F.3d 1385. Plaintiff's complaint states that "Defendant Rush's preferential treatment of Ms. Cody because of their sexual relationship, in that he did not require her to comply with the same policies and procedures as all other employees, created a hostile work environment for the employees with whom he was not having sex." (Compl., ¶ 10). Plaintiff further states in her complaint that the environment grew more hostile "because as a result of Plaintiff's conflicts with Ms. Cody, Defendant Rush had discontinued speaking with Plaintiff on an individual basis or discussing with her job related issues, except in a group setting." (Compl., ¶ 11). Plaintiff's complaint therefore appears to attribute the hostile work environment she experienced to the favoritism Mr. Rush showed for his paramour; however, generally the law is clear that "[f]avoritism, unfair treatment and unwise business decisions do not violate Title VII unless based on a prohibited classification." *Taken v. Oklahoma Corporation Commission*, 125 F.3d 1366, 1370 (10th Cir.1997); *Elger v. Martin Memorial Health Systems*, 6 F.Supp.2d 1351, 1353 (S.D.Fla.1998) (citing *Ayers v. American Tel. & Tel. Co.*, 826 F.Supp. 443, 445 (S.D.Fla.1993)).

■ Title VII seeks to eliminate discrimination in employment based on differences of race, color, religion, sex, or na-

---

5. The same five elements apply to hostile work environment cases, as well as tangible employment action cases. *See, e.g., Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1245 (11th Cir.1999)(en banc) *cert. denied*, 529 U.S. 1068, 120 S.Ct. 1674, 146 L.Ed.2d 483 (2000); *Johnson*, 234 F.3d at 508 n. 7.

tional origin. *See Trans World Airlines, Inc. v. Hardison,* 432 U.S. 63, 71 n. 6, 97 S.Ct. 2264, 53 L.Ed.2d 113 (1977). By using the word "sex", Congress sought "to strike at the entire spectrum of disparate treatment of men and women." *Taken,* 125 F.3d at 1369–70 (citing *Los Angeles Dep't of Water & Power v. Manhart,* 435 U.S. 702, 707 n. 13, 98 S.Ct. 1370, 55 L.Ed.2d 657 (1978)). "Sex" in Title VII, therefore, refers "to membership in a class delineated by gender" and proscribes "distinction[s] based on a person's sex, not his or her sexual affiliations." *DeCintio v. Westchester County Medical Center,* 807 F.2d 304, 306–07 (2nd Cir.1986); *see also Taken,* 125 F.3d at 1369–70 (citing cases); *Drinkwater,* 904 F.2d at 860. However, when a supervisor gives favorable treatment to his paramour, every other employee "with whom he is not having sex" experiences the resultant discrimination or harassment, regardless of their gender. (Compl., ¶ 10). *Taken,* 125 F.3d at 1370; *DeCintio,* 807 F.2d at 308; *O'Patka v. Menasha Corp.,* 878 F.Supp. 1202, 1206 (E.D.Wis.1995). Favoritism of a paramour, therefore, while perhaps unfair, "is gender neutral and 'more akin to nepotism' than sexism." *Elger,* 6 F.Supp.2d at 1353 (citing *Ayers,* 826 F.Supp. at 445).

In a per curiam opinion, the Eleventh Circuit has held that favoritism for a paramour by the plaintiff's supervisor did not violate Title VII's prohibition of sexual discrimination. *Womack v. Runyon,* 147 F.3d 1298, 1301 (11th Cir.1998). In reaching that conclusion, the Court cited favorably to the Second Circuit decision in *De-Cintio* and a 1990 policy guidance letter issued by the Equal Employment Opportunity Commission ("EEOC") which opined that "Title VII does not prohibit...preferential treatment based upon consensual romantic relationships." *Id.* at 1300; *see also,* EEOC Policy Guidance on Employer Liability under Title VII for Sexual Favoritism, EEOC Notice No. 915–048 (January 12, 1990). Indeed, as the Eleventh Circuit noted in *Womack,* "the great majority of courts which have addressed this question have reached the same result." *Id.* at 1300; *see Becerra v. Dalton,* 94 F.3d 145 (4th Cir.1996); *Taken,* 125 F.3d at 1370; *Hennessy v. Penril Datacomm Networks, Inc.,* 69 F.3d 1344, 1353–54 (7th Cir.1995) (in dicta); *DeCintio v. Westchester County Medical Center,* 807 F.2d 304, 308 (2nd Cir.1986); *Ayers,* 826 F.Supp. at 445; *Keenan v. Allan,* 889 F.Supp. 1320, 1375 n. 66 (E.D.Wa.1995), *aff'd,* 91 F.3d 1275 (9th Cir.1996) (in dicta); *O'Patka,* 878 F.Supp. at 1206; *Thomson v. Olson,* 866 F.Supp. 1267, 1272 (D.N.D.1994), aff'd, 56 F.3d 69, 1995 WL 296399 (8th Cir.1995); *see also Drinkwater,* 904 F.2d at 861–62.

Although the Eleventh Circuit has not expressly addressed whether Title VII encompasses a cause of action for a sexual harassment based hostile work environment, the facts and the record presented here do not indicate that a reasonable person in Plaintiff's position would have believed that this claim is distinguishable from the sex discrimination claim asserted in *Womack.* Several other courts, including one district court within the Eleventh Circuit, have held that a consensual sexual relationship between a supervisor and another employee does not create a hostile work environment in violation of Title VII. *Elger,* 6 F.Supp.2d at 1353; *O'Patka,* 878 F.Supp. at 1207; *Miller v. Aluminum Co. of America,* 679 F.Supp. 495, 502 (W.D.Pa. 1988), *aff'd,* 856 F.2d 184 (3rd. Cir.1988). Indeed, *Elger* presents similar facts to those in the instant case. In *Elger,* the United States District Court for the Southern District of Florida dismissed the plaintiff's Title VII sexually hostile work environment claim because the plaintiff could not establish that the discrimination arising out of his supervisor's affair with an employee subordinate to plaintiff occurred because of plaintiff's gender. *Id.* at 1353. As in the instant case, the subordinate

employee in *Elger*, was openly hostile and insubordinate to the plaintiff and carried on direct communications with the plaintiff's supervisor; similarly, the plaintiff's supervisor prevented the plaintiff from disciplining his paramour for her insubordination. *Id.* at 1352–53. In addition to the district court cases finding that the plaintiff failed to make out a *prima facie* case for a sexual harassment based hostile work environment claim based on favoritism, the Supreme Court has explained that the hostile work environment theory is merely an extension of the Title VII ban on gender discrimination. *See Meritor Savings Bank v. Vinson*, 477 U.S. 57, 64, 106 S.Ct. 2399, 91 L.Ed.2d 49 (1986). Finally, the EEOC Guidelines, themselves, state that "favoritism toward a 'paramour' may be unfair but it does not discriminate." EEOC Policy Guidance on Employer Liability under Title VII for Sexual Favoritism, EEOC Notice No. 915–048 (January 12, 1990); *see also Elger*, 6 F.Supp.2d at 1353.

Nevertheless, Plaintiff argues that she had an objectively reasonable belief that Mr. Rush's conduct violated the law because "Defendant's own ethics handbook makes the causal connection between sexual relationships...and the resultant sexual harassment" and because Defendant quickly disciplined her each time she complained about Mr. Rush's and Ms. Cody's relationship on baseless grounds. (Pl. Resp., at 17–18). Both these arguments fail, however, because Plaintiff is charged with knowledge of the substantive law. *See Harper*, 139 F.3d at 1388. Armed with clear holdings from the Eleventh Circuit as well as numerous other courts that favoritism is gender-neutral, a reasonable person would not conclude that her supervisor's favoritism for his paramour violated Title VII because her employer had adopted a more restrictive policy in its ethics handbook and had disciplined her quickly for complaining about the relationship.

Secondly, Plaintiff has not alleged any facts that would lead a reasonable person in her position to infer that her gender, as opposed to favoritism for a paramour, motivated the harassment she experienced. In Plaintiff's response in opposition to summary judgment, Plaintiff asserts for the first time that "the basis for her belief [that her employer was violating Title VII] is the conduct of Mr. Rush toward her and the fact that he did not treat any of the male employees in the office in a similar manner." (Pl. Resp. at 21). Thus, Plaintiff argues that she did not believe Defendants violated Title VII through her supervisor's preferred treatment of his paramour, but rather due to "the abuse she was subjected to because of her expectations regarding an employee she supervised." (Pl. Resp. at 21). Plaintiff states that she "never witnessed Mr. Rush cease speaking with the male managers" and she "never heard any complaints from [the male managers] that Mr. Rush would not answer their emails or telephone calls." (Pl. Resp. at 18). The issue presented to the Court, therefore, is whether a reasonable person in Plaintiff's position, as the manager of her supervisor's paramour, would have believed her supervisor was harassing her on account of her gender because, while he would not communicate with Plaintiff other than in group settings and would not return her telephone calls or e-mails, Plaintiff did not observe similar mistreatment of male managers. The undersigned finds that a reasonable person would not conclude that any harassment occurred because of her gender. Instead, a reasonable person would have believed that the hostile environment experienced by Plaintiff grew out of personal conflicts with Mr. Rush and Ms. Cody, irrespective of the gender of each person involved.

■ In Plaintiff's complaint and her deposition, Plaintiff, herself, cites her con-

flicts with Ms. Cody as the cause of Mr. Rush's decision to only speak to Plaintiff in group settings. (Compl. ¶ 11; Pl. Dep. at 45). Just as Congress did not enact Title VII to eliminate favoritism in the workplace, it similarly did not do so to eliminate personal animosities that do not arise out of gender-based discrimination. *See Lipphardt v. Durango Steakhouse of Brandon, Inc.*, 267 F.3d 1183, 1188 (11th Cir. 2001) (citing *McCollum v. Bolger*, 794 F.2d 602, 610 (11th Cir.1986)). Merely observing that Defendant did not discontinue speaking to male managers does not create an inference that Plaintiff's gender motivated Defendant to stop speaking to her. To hold otherwise would eviscerate the requirement that a plaintiff show that her gender prompted the discriminatory or harassing treatment.

Plaintiff does not allege that she was evaluated or judged on the basis of her sexuality. *See Drinkwater v. Union Carbide Corporation*, 904 F.2d 853, 862 (3rd Cir.1990). Additionally, Plaintiff does not advance evidence that Mr. Rush made any sexually-charged or even gender related comments to Plaintiff specifically or at work generally, that Mr. Rush made any sexual advances towards her or touched her in an offensive manner, or that Mr. Rush flaunted his relationship with Ms. Cody in the workplace. (Pl. Dep. at 42–43). *See also O'Patka*, 878 F.Supp. at 1208. In short, the only thing Plaintiff advances to support her claim that she reasonably believed Defendant harassed her "because . . . of her sex" is her status as a woman and the fact that various unidentified male managers did not receive similar mistreatment.

Accordingly, the Eleventh Circuit's holding in *Lipphardt v. Durango Steakhouse of Brandon, Inc.* is of no avail to Plaintiff. In *Lipphardt*, after a jury found in the employer's favor on a sexual harassment based hostile work environment claim and

in the plaintiff's favor on a retaliation claim, the magistrate judge granted the employer's motion for judgment as a matter of law on the retaliation claim because she found that the plaintiff did not have an objectively reasonable belief that she had been subjected to a sexually hostile work environment. *Lipphardt*, 267 F.3d 1183, 1185–88. On appeal, the Eleventh Circuit reversed the entry of judgment as a matter of law on the Title VII retaliatory discharge claim because the jury, apprised of the prior sexual relationship between the plaintiff and her supervisor, could find that a reasonable person in the plaintiff's position would have believed her employer was violating Title VII, even though the conduct alleged did not actually violate the law. *Id.* at 1188. The Eleventh Circuit found it important in *Lipphardt* that the conduct of the plaintiff's supervisor towards the plaintiff was sexual in nature, and the Court distinguished a binding precedent based on this fact. *Id.* at 1189. In the instant case, however, Plaintiff has presented no evidence with which a reasonable person could infer that her gender motivated the harassment she experienced.

Finally, Plaintiff alleges that she has direct evidence of Defendant's retaliatory intent with respect to her retaliation claim in Count II of her Complaint. However, because Plaintiff did not have an objectively reasonable belief that she was opposing a violation of Title VII by her employer, Plaintiff cannot show that she engaged in statutorily protected conduct as required for a *prima facie* case of retaliation.

Because Plaintiff has not presented evidence to show that she had an objectively reasonable belief that she was opposing a violation of Title VII by her employer, through either a theory based on favoritism of a paramour or gender-based discriminatory treatment toward herself, Plaintiff fails to establish a *prima facie* case of retaliation for Count II and III of

her complaint. Accordingly, the undersigned RECOMMENDS that the Defendant's motion for summary judgment be GRANTED on Count II and III of Plaintiff's complaint.

## C. Plaintiff's Title VII Sexual Harassment Hostile Work Environment Claim

Plaintiff alleges in her complaint that Defendant subjected her to a hostile work environment based on sexual harassment, in violation of Title VII, because Mr. Rush, gave preferential treatment to another employee with whom he had a sexual relationship, stopped speaking to Plaintiff except in group settings, and ultimately terminated Plaintiff's employment. (Compl. ¶ ¶ 10, 11). Plaintiff further alleges in her complaint that Mr. Bynum, the Regional Vice President of Adesa, knowingly permitted this conduct to occur. (Compl. ¶ 17). Defendant argues in its motion for summary judgment that Plaintiff cannot make out a prima facie case under Title VII for a sexual harassment based hostile work environment claim because favoritism toward a workplace paramour is not actionable as sex discrimination as it is gender neutral and does not alter the terms or conditions of the plaintiff's employment, and because the instant conduct is not sufficiently severe or pervasive. (DMSJ at 13). In Plaintiff's response in opposition to Defendant's motion for summary judgment, Plaintiff does not address any of Defendant's arguments for summary judgment on her sexual harassment hostile work environment claim. (See, generally, Pl. Resp.). Indeed, while addressing Defendant's arguments for summary judgment on her retaliation claims, Plaintiff admits that she cannot prove her sexual harassment claim. (Pl. Resp. at 17).

 Local Rule 7.1B states that a "[f]ailure to file a response shall indicate that there is no opposition to the motion."

Local Rule 7.1B, N.D.Ga. When a party does not "respond to an argument or otherwise address a claim, the Court deems such argument or claim abandoned." Hudson v. Norfolk S. Ry., 209 F.Supp.2d 1301, 1324 (N.D.Ga.2001); see also Marion v. DeKalb Co., Ga., 821 F.Supp. 685, 688, 689 fn. 4 (N.D.Ga.1993) (holding that plaintiff abandoned his negligence claim by failing to respond to defendant's motion for summary judgment on this issue in plaintiff's response brief); Resolution Trust Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir.1995) (en banc) (stating that "grounds alleged in the complaint but not relied upon in summary judgment are deemed abandoned" while declining to exercise its discretion to consider on appeal an argument in response to Defendant's motion for summary judgment which Plaintiff had previously failed to allege); Bute v. Schuller Int'l Inc., 998 F.Supp. 1473, 1477 (N.D.Ga.1998) (finding Plaintiff abandoned a claim for retaliation under the ADA by failing to respond to Defendant's argument on summary judgment that Plaintiff failed to exhaust administrative remedies). However, "the district court cannot base the entry of summary judgment on the mere fact that the motion was unopposed," because Federal Rule of Civil Procedure 56(e) only permits the entry of summary judgment against an adverse party who fails to respond if it is appropriate. United States v. One Piece of Real Property Located at 5800 SW 74th Ave., 363 F.3d 1099, 1101 (11th Cir.2004); see also Dunlap v. Transamerica Occidental Life Ins. Co., 858 F.2d 629, 632 (11th Cir.1988) (per curiam); Fed.R.Civ.P. 56(e). Therefore, the Court must consider the merits of the motion to "ensure that the motion itself is supported by evidentiary materials." Id. This requires the Court review all the evidentiary materials submitted in support of the motion; however, a sua sponte review of all materials in the file is not necessary. Id.

■ Reviewing the merits of Defendant's motion, the undersigned finds that Defendant is entitled to summary judgment on Plaintiff's claim for a sexual harassment based hostile work environment. As explained above within the discussion of Plaintiff's retaliation claims, Plaintiff cannot establish a *prima facie* case of sexual harassment based hostile work environment because favoritism is gender neutral and Plaintiff has failed to adduce any other evidence that her gender motivated the hostile work environment. Accordingly, Plaintiff's claim for sexual harassment hostile work environment is abandoned, and the undersigned **RECOMMENDS** that Defendant's motion for summary judgment on Plaintiff's sexual harassment hostile work environment claim be **GRANTED**.

**D. *Plaintiff's State Law Defamation Claim***

Because the Court has already recommended granting summary judgment on Plaintiff's federal law claims, the undersigned is now recommending that Plaintiff's state law claims be dismissed. According to 28 U.S.C. § 1367, "[t]he district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if the district court has dismissed all claims over which it has original jurisdiction." 28 U.S.C. § 1367(c)(3). The Supreme Court explained that exercising supplemental jurisdiction requires a federal court to consider judicial economy, convenience, fairness, and comity. The Court held that:

> When the balance of these factors indicates that a case properly belongs in state court, as when the federal-law claims have dropped out of a lawsuit in its early stages and only state-law claims remain, the federal court should decline the exercise of jurisdiction by dismissing the case without prejudice.

*Carnegie–Mellon Univ. v. Cohill*, 484 U.S. 343, 350, 108 S.Ct. 614, 98 L.Ed.2d 720 (1988)(footnote omitted). *See also Novak v. Cobb County–Kennestone Hosp. Auth.*, 849 F.Supp. 1559 (N.D.Ga.1994) (dismissing state law claims without prejudice upon granting summary judgment on all pending federal claims), *aff'd*, 74 F.3d 1173 (11th Cir.1996). Because it is recommended that the Plaintiff's federal claims be dismissed, Plaintiff's only remaining claims rely on applicable state law. The undersigned therefore **RECOMMENDS** that the Plaintiff's remaining state law claims be **DISMISSED WITHOUT PREJUDICE**.

### *RECOMMENDATION*

For the foregoing reasons, **IT IS RECOMMENDED** that Defendant's Motion for Summary Judgment be **GRANTED**. Docket Entry [39].

January 10, 2006.